UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ———————————————— x | | |
| DAVID LUCESCU, Individually and On Behalf of All Others Similarly Situated, | : : : | Civil Action No. 1:09-cv-04691-DLC |
| Plaintiff, | : : | CLASS ACTION |
| vs. | : : : | AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| MIKE ZAFIROVSKI and PAVI BINNING, | : : : | |
| Defendants. | : : | |
| ———————————————— x | | |

Lead Plaintiffs Kien Chen and Moreno Minto ("Lead Plaintiffs or "Plaintiffs"), by their undersigned attorneys, make the allegations set forth herein based upon knowledge as to their own acts and upon the investigation conducted by Lead Plaintiffs' counsel.  That investigation included the examination and analysis of information obtained from public and proprietary sources – including, *inter alia*, United States Securities and Exchange Commission ("SEC") filings by Nortel Networks Corporation ("Nortel" or the "Company"), regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, interviews with former employees of the Company, public filings in Nortel's bankruptcy proceedings in the United States and Canada, and other publicly available information.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of purchasers of Nortel securities listed on a stock exchange in the United States between May 2, 2008 and January 13, 2009, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Prior to its bankruptcy and liquidation, Nortel was a multinational telecommunications and data networking equipment supplier headquartered in Ontario, Canada.

3.      In the years leading up to the Class Period, Nortel was struggling to rebuild its balance sheet and reputation in the wake of a devastating accounting fraud that came to light in 2004 and led to the restatement of billions of dollars in revenue.  Beginning in late 2005, Defendant Mike Zafirovski, Nortel's Chief Executive Officer ("CEO"), implemented a series of

"turnaround" initiatives designed to address the Company's operational challenges and return Nortel to profitability.

4.      During the Class Period, Defendants made materially false and misleading statements highlighting the purported success and progress of Nortel's various turnaround initiatives, claiming that Nortel was experiencing "growing momentum with customers," and continuously reaffirming the Company's full-year 2008 guidance.  Those statements were materially false and misleading when made because, in truth – as described by numerous former employees of Nortel – the Company's turnaround efforts were not succeeding and Nortel was struggling to cut costs and improve profitability.  In addition, demand for Nortel's products was plummeting as the Company fell behind on technological innovations and customers scaled back orders.

5.      Defendants further misled investors by failing to timely write down *$2.379 billion* of reported goodwill associated with Nortel's four reporting segments, which Defendants knew or recklessly disregarded was impaired by no later than the start of the Class Period.  As a consequence, Nortel's income and assets were falsely inflated throughout the Class Period, and Defendants' representations that the Company's financial results were prepared in conformity with U.S. Generally Accepted Accounting Principles ("GAAP") were materially false and misleading when made.

6.      Defendants were motivated to delay recording the goodwill impairment charge so that Nortel could conduct a private placement of 10.75% senior unsecured notes due 2016 (the "2016 Notes Offering") on favorable terms that yielded the Company approximately $655 million in net proceeds and enabled it to redeem the entire outstanding principal of 4.25% convertible senior notes due September 1, 2008.  Speaking at Nortel's June 11, 2008 Investors'

Day, Defendant Pavi Binning, Nortel's Chief Financial Officer ("CFO"), proclaimed that the 2016 Notes Offering had taken any concerns about Nortel's liquidity "off the table" and that Nortel's capital was now more than sufficient for implementing the Company's turnaround initiatives.

7.      On August 1, 2008, Defendants once again reaffirmed the Company's full-year 2008 guidance, stating that Nortel was "on track to meet [its] targets for the year" as a result of "strong customer momentum in key growth areas of [the] business."  When an analyst expressed skepticism about Nortel's ability to attain its full-year guidance, Defendant Zafirovski replied that: "We have thorough discussions with all our businesses, and it gives us the confidence to confirm the guidance[.]" Similarly, when an analyst asked "[w]hy not be a little more prudent in terms of your guidance?," Defendant Binning responded that: "There is without [a] doubt confidence that the trajectory that we are trying to build is beginning to emerge. . . . [W]e have reiterated the guidance to date, and we wouldn't have done that if we hadn't felt confident about achieving it."

8.      During Nortel's August 1, 2008 conference call, Defendant Zafirovski – under questioning from analysts – admitted that one of Nortel's Carrier Networks customers had "shut the door on short-term capital expenditures," but failed to disclose the widespread, long-term nature of the decline in orders that Nortel had been experiencing, stated that Nortel's guidance took the customer's spending freeze into account, and insisted that Nortel was not losing market share.  In response to the disclosure of a "short-term" spending freeze by one of Nortel's Carrier Networks customers, the price of Nortel common stock declined more than 14%.  However, Defendants' misleading reassurances and continued positive statements about the Company's business prevented a more substantial decline in Nortel's stock price.

9.      Just six weeks later, on September 17, 2008, Defendants announced that Nortel had revised its full-year 2008 guidance, citing "significant pressure as Carrier customers cut back their capital expenditures further than previously expected and certain Enterprise and certain [Metro Ethernet Networks ('MEN')] customers defer new IT and optical investments." Defendants also disclosed that Nortel was engaging in a "comprehensive review" of its business and that "planning" was "underway for further restructuring and other cost reduction initiatives." Finally, Defendants announced that Nortel planned to sell its MEN business, which included the 40/100G optical networking technology that the Company had recently launched and repeatedly highlighted as an important source of revenue growth.   In response to the Company's announcements, the price of Nortel stock plummeted more than 49%.

10.      On November 10, 2008, Nortel belatedly announced that it had recorded a goodwill impairment charge of ***$1.142 billion***, representing the entire amount of the reported goodwill associated with its Enterprise and MEN business segments.  In response, the price of Nortel common stock tumbled more than 18%.  That impairment charge was soon followed by the Company's write off of the entire $1.087 billion goodwill balance for its Global Services segment and the $151 million goodwill balance for its Carrier Networks segment during the fourth quarter of 2008.

11.      On December 10, 2008, investors began to discover that, in contrast to Defendants' representations that Nortel's turnaround efforts were succeeding, those efforts were a complete failure, and Nortel was performing so far below expectations that the Company would likely file for bankruptcy protection.  On that date, *The Wall Street Journal* reported that Nortel had "sought legal counsel to explore bankruptcy-court protection from creditors in the

event that its restructuring plan fails, according to people familiar with the situation."  This news

caused the price of Nortel common stock to decline an additional 23%.

12.     Finally, on January 14, 2009, Nortel announced that it would seek bankruptcy

protection in Canada and the United States.  In response to this news, the price of Nortel's

common stock plummeted more than 65%, to close at just $0.11 per share on January 14, 2009 –

a staggering decline from the stock's Class Period high of $10.21 per share.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the

SEC [17 C.F.R. §240.10b-5].

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28

U.S.C. §1391(b).  Many of the acts charged herein, including the dissemination of materially

false and misleading information, occurred in substantial part in this District.

16.     In connection with the acts alleged in this Complaint, Defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications and the facilities of the New York

Stock Exchange ("NYSE"), a national securities market located in this District.

## PARTIES

17.     Lead Plaintiffs purchased Nortel securities during the Class Period, as set forth in

the attached certifications and incorporated herein by reference, and have been damaged thereby.

18.     At all relevant times, non-party Nortel described itself as a global supplier of end-

to-end networking products and solutions that helped organizations enhance and simplify

communications.   The Company maintained its principal executive offices at 195 The West Mall, Toronto, Ontario, Canada.   Prior to and during the Class Period, Nortel's common stock was publicly traded on the NYSE and the Toronto Stock Exchange under the ticker symbol "NT."   On January 14, 2009, Nortel and its core operating subsidiaries initiated creditor protection proceedings in Canada, the United States and the United Kingdom.   For that reason, the Company is not named as a defendant in this action.

19.     Defendant Mike Zafirovski ("Zafirovski") served as CEO, President and a member of the Board of Directors of Nortel beginning on November 15, 2005.

20.     Defendant Pavi Binning ("Binning") served as CFO and Executive Vice President of Nortel beginning on November 12, 2007.   On March 2, 2009, Nortel announced that Binning would serve as its Chief Restructuring Officer.

21.     Defendants Zafirovski and Binning are collectively referred to herein as "Defendants."

22.     During the Class Period, Defendants, as senior executive officers and/or directors of Nortel, were privy to confidential and proprietary information concerning Nortel and its operations, finances, financial condition, and present and future business prospects.   As discussed below, Defendants had access to material, adverse, non-public information concerning Nortel via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.   Because of their possession of such information, Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

23.     Defendants are liable as direct participants in the wrongs complained of herein. In addition, Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, Defendants were able to and did, directly or indirectly, control the conduct of Nortel's business.

24.     Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, Defendants had the opportunity to commit the fraudulent acts alleged herein.

25.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were registered with the SEC pursuant to the Exchange Act, and were traded on the NYSE and governed by the federal securities laws, Defendants had a duty to promptly disseminate accurate and truthful information with respect to Nortel's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Nortel securities would be based upon truthful and accurate information. Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

26.     Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Nortel securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Nortel's business, operations and management and the intrinsic value of Nortel securities; and (ii) caused Plaintiffs and other members of the Class (defined below) to purchase Nortel securities at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

27.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Nortel securities listed on a stock exchange in the United States between May 2, 2008 and January 13, 2009, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of the immediate families of each Defendant, the Company and its officers and directors at all relevant times, any entity in which any excluded party has or had a controlling interest, or which is or was related to or affiliated with any excluded party, and the legal representatives, heirs, successors or assigns of any such excluded party.

28.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Nortel securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Nortel or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

29.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class have been similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

30.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

31.     Common questions of law and fact apply equally to all members of the Class and predominate over any questions solely affecting individual Class members.   Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements and omissions made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and prospects of Nortel;

(c)     whether the price of Nortel securities was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

32.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## CONFIDENTIAL SOURCES

33.     The allegations made herein are further supported by the first-hand knowledge of 13 confidential witnesses ("CWs").  These individuals are former Nortel employees who each served in a position at Nortel that provided them with access to the information they are alleged to possess.

34.     CW1 worked at Nortel from 1998 until March 2008, and most recently was a Program Manager responsible for managing research and development projects in Nortel's wireless business.

35.     CW2 worked at Nortel's corporate headquarters in Toronto, Canada from 1987 until November 2008, and most recently served as a Director of Technical Sales and Engineering.  In that position, CW2 managed a team of approximately 15 sales engineers, and was responsible for providing technical sales consultations to Nortel's carrier customers based in Canada, including Bell Canada and TELUS.

36.     CW3 worked at Nortel for approximately twenty years, until March 2009, most recently as a Senior Account Manager based in Atlanta, Georgia.  In that position, CW3 was a member of a team responsible for Nortel's wireless sales to AT&T in the United States.

37.     CW4 was employed by Nortel from 1989 until September 2008, and most recently served as Regional Sales Director for the Southeast Region.  In that position, CW4 managed a team of approximately 20 sales personnel responsible for the sale of Nortel's "wireline" (*i.e.*, non-wireless), broadband and optical products in the Southeastern United States, where AT&T was the Company's largest customer.

38.     CW5 worked as a Network Engineer at Nortel's offices in Richardson, Texas from August 2000 to April 2009.  In that position, CW5 worked on designing wireless and landline network architecture for customers including AT&T, Vodafone and Sprint.

39.     CW6 was employed by Nortel from 1992 to 2009, and most recently worked as a Wireless Product Manager in Richardson, Texas.

40.     CW7 was the head of Structured Finance and Credit at Nortel from November 2006 to May 2009.

41.     CW8 worked at Nortel's offices in Richardson, Texas from 1995 until May 2009. During the Class Period, CW8 was a Senior Manager of Global Finance Governance, and was responsible for providing guidance to Nortel's technical accounting group regarding the application of GAAP with respect to revenue recognition.

42.     CW9 worked at Nortel from 2000 until May 2010 as an Inventory Analyst and Senior Financial Analyst.   During 2008, CW9 was primarily responsible for performing accounting reconciliations in connection with the implementation of Nortel's new "SAP ERP" software system (defined below), which entailed transferring data from Nortel's legacy Oracle system to the SAP system (defined below) and reconciling any discrepancies.

43.     CW10 was employed by Nortel throughout the Class Period as an SAP Finance Manager.  In that position, CW10 was involved in the ongoing implementation of Nortel's SAP system, which was part of the Company's efforts to improve its internal controls in the wake of its restatements.

44.     CW11 is a former Internal Audit Manager who worked at Nortel from 2005 to October 2009.   CW11 was primarily responsible for testing information technology and

accounting controls in Nortel's corporate finance department for compliance with the Sarbanes-Oxley Act of 2002.

45.     CW12 is a former Sales Engineer who worked in Nortel's sales department in Parsippany, New Jersey from 1995 until January 2009.  In that position, CW12 supported a sales team responsible for Verizon, Nortel's largest customer, including by preparing contracts and pricing for product sales to Verizon.  CW12's responsibilities included entering product prices into Verizon's "PeopleSoft" system, which was used by Verizon to place purchase orders for Nortel's products.  CW12 reported directly to the Vice President for the Verizon Account, and reported indirectly to Richard Lowe, the President of Nortel's Carrier Networks segment.

46.     CW13 began working at Nortel in 1999.  From 2001 through 2007, CW13 was a Senior Manager of Global Sales and Solutions Marketing / Global Professional Services, which involved working closely with Nortel's carrier customers to understand their business needs and identify opportunities for Nortel.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

47.     Prior to its bankruptcy and liquidation, Nortel supplied telecommunications and data networking products and solutions to small businesses, multi-national corporations, government agencies, cable operators, telecommunications service providers, and internet service providers, and operated in 150 countries.

48.     The Company's operations were organized into four segments: (1) Carrier Networks; (2) Enterprise Solutions; (3) MEN; and (4) Global Services.  The Carrier Networks segment provided wireless and landline network solutions, including "CDMA" (Code Division Multiple Access) technology, a driving force behind wireless networks.  The Enterprise Solutions segment provided communications solutions including Ethernet routing, "IP" (internet

protocol), wireless "LANs" (local area networks), security, "SIP" (session initiation protocol) contact centers, messaging and conferencing. The MEN segment served carrier and large enterprise customers, with a portfolio that included optical networking, Ethernet switching, and multiservice switching products. The Global Services segment provided network implementation, support, management, and application services.

### Background of Nortel's
### Turnaround Efforts

49.     Nortel's reputation and business were marred by a devastating accounting fraud that came to light in 2004, which led to the restatement of billions of dollars in revenue affecting a multi-year period, the firing of the Company's top three executives, and a global settlement of shareholder class actions brought in the U.S. and Canada totaling more than $2.4 billion in cash and stock. Nortel paid an additional $35 million to settle civil fraud charges brought by the SEC, and agreed to implement remedial measures to improve its corporate governance.

50.     The scandal severely weakened the Company's balance sheet and left it with a BBB- credit rating. Subsequently, Nortel focused on rebuilding its profitability and reputation by implementing a series of restructuring and "turnaround" plans. Among other things, Nortel shrunk its operations and reduced its workforce by approximately two-thirds, from more than 90,000 employees in 2000, to approximately 30,000 at the end of 2008. Beginning in late 2005, under Defendant Zafirovski's leadership, Nortel commenced a Business Transformation Plan designed to address the Company's most significant operational challenges, simplify its organizational structure and return Nortel to profitability.

**Nortel's Business Was in Far Worse Condition
than Investors Were Led to Believe**

**Nortel's Turnaround Efforts Were Not Meeting with Success**

51.     Contrary to Defendants' Class Period statements highlighting the success of Nortel's turnaround efforts, in truth, the Company was plagued with financial and customer-relations difficulties and was struggling to implement its turnaround plans.

52.     *Ineffective turnaround initiatives*: Although Nortel was attempting to implement numerous turnaround plans prior to and during the Class Period, CW1, a former Project Manager responsible for managing research and development projects in Nortel's wireless business, reported that none of the plans were succeeding.  According to CW1, there was a high degree of skepticism among Nortel employees regarding Defendant Zafirovski's turnaround plans, in part because it seemed that Zafirovski was solely interested in cutting costs and implementing his "Lean Six Sigma" projects.[1]  CW2, a former Director of Technical Sales and Engineering responsible for providing technical sales consultations to Nortel's Canadian customers, confirmed that the consensus among Nortel employees was that the Company's cost-cutting plans and "Lean Six Sigma" initiatives were burdensome and disruptive.

53.     *Loss of competitive edge*: CW1 explained that Defendant Zafirovski's overall strategy was to narrow the Company's focus by reducing its product offerings and cutting costs. This was problematic because continuous development of innovative technology was essential to

---

[1]     "Lean Six Sigma" is a managerial concept designed to result in the elimination of eight kinds of waste (classified as defects, overproduction, waiting, non-utilized talent, transportation, inventory, motion, and extra-processing) and improved capability of performance.  The training for Lean Six Sigma is provided through a belt-based training system, similar to karate. According to Nortel's 2007 Form 10-K, the Company "[u]ndertook over 250 Lean Six Sigma projects" that year.

Nortel's business, but Nortel's turnaround plans did not include sufficient research and development initiatives.

54.     CW1 stated that Zafirovski accelerated the cost-cutting measures to the point that investments in research and development were so scaled back that Nortel had progressively fewer new products that it could introduce to the market.  As a result, it was apparent to CW1 by the time of his/her departure in March 2008 that Nortel had lost its technological edge and become completely uncompetitive.

55.     For example, in contrast to the declining demand in other areas of Nortel's business, CW2 stated that demand in Canada for the Company's "40/100G" optical network technology, which allowed customers to increase bandwidth without replacing existing networks, was growing during the Class Period.  Although CW2 believed that Nortel's optical business in Canada  (in which CW2's team specialized) was performing well, CW2 learned in August 2008 that Nortel planned to downsize the business.  Then, on September 17, 2008, Nortel announced that it planned to sell off its entire Metro Ethernet Networks segment, which included 40/100G, even though the Company had recently highlighted 40/100G as an important area of future revenue growth.  Shortly thereafter, in November 2008, CW2 and the majority of his/her team were laid off.

56.     *Loss of customer confidence*: CW3, a former Senior Account Manager responsible for Nortel's wireless sales to AT&T in the United States, observed that as a result of Nortel's past accounting scandal, the Company was continuously struggling to rebuild its customers' trust and confidence.  As CW3 noted, the massive layoffs that Nortel implemented prior to and during the Class Period, including downsizing of customer-facing areas such as sales support and product management, further harmed Nortel's customer relationships.  For example,

Nortel was unable to timely respond to customers' requests for product presentations. Nortel also seemed unable to develop new products and product features that were valuable to its customers, which, according to CW3, may have been due to Nortel's substantial spending cuts to its research and development programs.

57.     CW4, a former Regional Sales Director for the Southeastern United States, likewise opined that Nortel's reduction of its workforce to bare bones levels led to a lack of resources in key areas of the Company's business and harmed its customer service. CW4 confirmed that Nortel's ongoing workforce reduction elicited numerous customer complaints, and key customers threatened to cut their orders if Nortel continued to reduce its workforce. CW4 said that these customer complaints were conveyed to Nortel's executive management, including Defendants.

58.     *Product quality issues*: CW5, a former Network Engineer involved in designing networks for customers including AT&T, Vodafone and Sprint, stated that Nortel suffered from product quality issues, and after the Company's products were delivered to customers, the customers often reported experiencing numerous problems. CW6, a former Wireless Product Manager, confirmed that customer complaints due to quality problems were prevalent during the Class Period. For example, CW6 was aware of an email sent by the head of a major customer directly to Defendant Zafirovski stating words to the effect that: "We'll rip your network apart and send the pieces back to you because of your incompetency."

59.     *Financing difficulties*: CW7, the former head of Structured Finance and Credit, stated that during the Class Period, Nortel experienced difficulties obtaining badly needed financing due to the Company's weak balance sheet, which made it difficult for Nortel to sustain its operations. According to CW7, Nortel's need for financing was exacerbated by the fact that

the Company had a large product base that was very expensive to maintain.  In addition, Nortel was pursuing the development of 4G wireless network technology, which was a costly undertaking.  CW7 observed that Nortel had no choice but to continue developing 4G technology, however, because it was considered the future of the telecommunications industry and thus was essential to Nortel's continued competitiveness.

60.    *Operational problems*: During the Class Period, Nortel's business was plagued by persistent operational problems.  CW5 explained that Nortel's operations were hampered by a multitude of different systems, such as dozens of accounting systems, which made the Company's operations cumbersome and inefficient.  According to CW5, one of the goals of Nortel's turnaround initiatives was to streamline the Company's accounting and numerous other inefficient systems.  However, Nortel lacked the necessary funds to implement these initiatives, and consequently, they were taking an inordinate amount of time.  As a result of Nortel's inefficient operating systems, CW5 reported that the Company experienced persistent project delays and difficulties delivering products to customers on time.

61.    *Problems implementing the SAP system*: Throughout the Class Period, Nortel was also struggling to streamline its operations, including by replacing the Company's existing software system with a new "SAP ERP" software system (the "SAP system").[2]  CW8, a former Senior Manager of Global Finance Governance, explained that the SAP system was considered an important initiative that was necessary to improve Nortel's systems and business processes.  However, CW8 reported that implementation of the SAP system proved to be very difficult and subject to substantial delays, in part because of Nortel's poor financial condition.

---

[2]     SAP AG is a German multinational software corporation whose best known product is its enterprise resource planning ("ERP") business management software.  ERP is a suite of integrated applications that companies utilize to store and manage data from every stage of their businesses.

62. According to CW9, a former Inventory Analyst and Senior Financial Analyst responsible for performing accounting reconciliations in connection with the implementation of the SAP system, Nortel's rollout of the SAP system had been underway for a considerable length of time when CW9 became involved with it in 2008, and the system still was not fully implemented when CW9 left the Company in May 2010. CW8, CW10, a former SAP Finance Manager, and CW11, a former Internal Audit Manager, each confirmed that implementation of the SAP system was still underway in 2008.

63. CW9 and CW10 both reported that Nortel was experiencing ongoing problems with its implementation of the SAP system throughout 2008, due in part to resistance from various individuals throughout the Company.

64. CW9 stated that another significant obstacle to Nortel's implementation of the SAP system was the Company's unwillingness to tailor the SAP system to its business operations, or to change its business operations to accommodate the SAP system. As a result, complicated work-arounds were necessary to enable the SAP system to operate in conjunction with Nortel's myriad of business operations.

65. CW9 explained that although Nortel had spent millions of dollars attempting to implement the SAP system, the lengthy delays in the system's rollout meant that Nortel remained reliant on its legacy Oracle system, which continued to operate alongside the SAP system even as portions of the SAP system became operational.

66. Because the two systems continued to operate in tandem, CW9 observed that Nortel was heavily reliant on Excel spreadsheets for many of its financial reporting functions. In particular, CW9 reported that data from the Oracle system needed to be downloaded into Excel spreadsheets and then manually entered into the SAP system. CW10 and CW11 confirmed that

due to Nortel's ongoing rollout of the SAP system, significant manual input of data was required. CW9 and CW11 stated that this labor intensive exercise increased the potential for errors.

**Nortel Was Experiencing Decreased Demand for Its Products
Prior to and During the Class Period**

67.     Instead of the "growing momentum with customers" that Defendants publicly claimed Nortel was experiencing, demand for the Company's products was plummeting in multiple areas of its business prior to and during the Class Period.

68.     *Verizon*: According to CW12, a former Sales Engineer who supported a sales team responsible for Verizon, Nortel's largest customer, it was apparent by early 2008 that Nortel was experiencing a significant decline in revenues from Verizon.  CW12 stated that Nortel's revenue from Verizon decreased from approximately $800 million in 2006, to $500-$600 million by 2008.  CW12 was aware of the number of purchase orders placed by Verizon as a result of his/her access to Verizon's PeopleSoft system.

69.     CW12 reported that the decline in revenue from Verizon was due in part to Nortel's failure to win Verizon's "LTE" (Long Term Evolution) business, the new "fourth generation" mobile broadband standard.  According to CW12, Nortel was actively pursuing Verizon's LTE business during mid-2008, but by the end of 2008, it was clear that Nortel had lost the bid to equipment providers Ericsson and Alcatel Lucent.  CW12 indicated that Verizon decided against Nortel because it was not a financially solid company and had persistent operational problems.

70.     *AT&T*: According to CW3, AT&T announced at the very end of 2007 or the beginning of 2008 that it was reducing its forecasted capital expenditures for 2008.  AT&T's cutbacks were so substantial that CW3 only achieved 60% of his/her sales quota for 2008, and CW3's sales team likewise fell short of its sales quota for the year.

71.     CW3, who was a member of Nortel's AT&T account team, stated that Nortel's executive management held detailed reviews of the impact that customers' forecasted capital expenditures would have on Nortel, which reviews were based on presentations made by the Company's finance and sales teams.  CW3 further stated that Defendant Zafirovski attended regular meetings with AT&T's CEO, during which AT&T representatives would inform Nortel of their business priorities and concerns, and Nortel representatives would present the Company's business plan and discuss how Nortel was addressing AT&T's concerns. Accordingly, Nortel's executive management would have been aware of the expected reduction in business from AT&T.

72.     CW4 confirmed that AT&T, Nortel's second largest customer, began substantially cutting its capital expenditure budgets in the first half of 2008, which inevitably meant that Nortel's sales to AT&T would decline.  According to CW4, during the first half of 2008, AT&T decreased its orders from Nortel by approximately 50 percent compared to the first half of 2007.  CW4 was aware of AT&T's reduction in capital expenditures because CW4 attended regular meetings with the AT&T representatives who were responsible for making major procurement decisions.

73.     _Sprint_: According to CW2, Sprint announced in April or May 2008 that it would not order any additional equipment from Nortel during 2008.

74.     _Level 3 Communications_: According to CW13, a former Senior Manager of Global Sales and Solutions Marketing / Global Professional Services, annual revenues from Level 3 Communications, which had at one time been approximately $750 million, dropped to just $50 million by 2007 to 2008.

75.    *Other customers*:  In addition, according to CW4, many of Nortel's other customers were significantly reducing their orders during the first half of 2008.  CW4 reported that Nortel's customers began scaling back their orders in late 2007, prior to the start of the Class Period.    Thereafter, throughout the first half of 2008, Nortel experienced continuously weakening sales.

76.    CW1 confirmed that Nortel had been losing market share to competitors prior to and during the Class Period, leading CW1 to question the positive outlook that Defendants presented to investors during the first half of 2008.

77.    The ongoing deterioration of customer orders was discussed in emails sent to Nortel's sales personnel (including CW4) by the Vice President of North American Sales, Randy Dodd.  According to CW4, the declining customer sales were reported to Mr. Dodd during weekly sales review conference calls, which also featured detailed discussions about Nortel's forecasts for the remainder of the reporting period.  CW4 believed that Defendant Zafirovski, in turn, received consolidated sales reports showing Nortel's deteriorating sales figures.

78.    In light of the significant declines in customer orders, CW4 and his/her colleagues were curious about Defendants' positive statements about Nortel's business and prospects during the first half of 2008, and were wondering where all this good news was coming from.

79.    CW2 reported that Nortel experienced a general decline in demand from Canadian customers for its wireline equipment during the Class Period, as those customers chose not to expand their wireline networks.  According to CW2, there was also a notable decline in demand in Nortel's wireless business in Canada by early 2008, after Nortel's customers Bell Canada and TELUS selected competitors Huawei and Nokia Siemens to provide them with high speed wireless equipment.

**Defendants Improperly Delayed Recognizing a Goodwill Impairment Charge**

80.     During the Class Period, Defendants represented that Nortel's financial statements were prepared in conformity with GAAP.  These representations were materially false and misleading when made because Defendants, in violation of GAAP, knowingly or recklessly delayed the recognition of a goodwill impairment charge of ***more than $2.3 billion***, thereby falsely inflating the Company's income and assets during the Class Period.  After the end of the Class Period, Nortel belatedly recognized a $2.379 billion impairment charge on the entirety of its previously reported goodwill.

81.     In its Form 10-K for the year ended December 31, 2007 (the "2007 Form 10-K"), Nortel explained that it operated its business via four reportable segments: Carrier Networks, Enterprise Solutions, MEN, and Global Services.  The 2007 Form 10-K included Nortel's annual financial statements for the same fiscal period, the year ended December 31, 2007.  The 2007 annual financial statements reported that Nortel's goodwill at December 31, 2007 was valued at $2.559 billion, which it allocated among its reportable segments as follows:

| | Enterprise Solutions | Carrier Networks | Metro Ethernet Networks | Global Services | Other | Total |
|---|---|---|---|---|---|---|
| Balance — as of December 31, 2005(a) | $  484 | $  165 | $  664 | $1,102 | $171 | $2,586 |
| Change: | | | | | | |
|    Additions(b) | 9 | — | 14 | 20 | — | 43 |
|    Disposals(c) | (9) | (10) | (15) | (22) | — | (56) |
|    Foreign exchange | 3 | 4 | 3 | 5 | — | 15 |
|    Other(d) | (6) | (15) | (11) | (27) | — | (59) |
| Balance — as of December 31, 2006 | $  481 | $  144 | $  655 | $1,078 | $171 | $2,529 |
| Change: | | | | | | |
|    Additions(e) | 2 | 5 | 3 | 8 | — | 18 |
|    Disposals | — | — | — | — | — | — |
|    Foreign exchange | 1 | 3 | 2 | 6 | — | 12 |
| Balance — as of December 31, 2007 | $  484 | $  152 | $  660 | $1,092 | $171 | $2,559 |

82.     Goodwill, an intangible asset without physical substance, is recorded when an entity acquires a business.  The reported value of goodwill represents the future economic benefits in a business combination that are not individually identified and separately recognized.

In essence, goodwill reflects the going-concern value of the business acquired and its expected contribution to the combined enterprise's future earnings growth.

83.     During the Class Period, Nortel was required to account for its goodwill in accordance with GAAP's Statement of Financial Accounting Standard ("SFAS") No. 142, *Goodwill and Other Intangible Assets.*[3] Compliance with GAAP is a fundamental obligation of publicly traded companies.  As set forth in SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate."  [17 C.F.R. §210.4-01(a)(1).]  Regulation S-X also requires that interim financial statements comply with GAAP.  [17 C.F.R. §210.10-01(a).]

84.     GAAP required Nortel to periodically determine if the reported value of its goodwill was impaired.  Pursuant to SFAS No. 142, goodwill is to be tested for impairment ***at least annually, and more often when events or circumstances arise indicating the goodwill could be impaired***.  The value of goodwill is impaired when the carrying amount, *i.e.*, the amount of goodwill reported in the financial statements, exceeds its fair value  *See, e.g.*, SFAS No. 142 ¶¶18-29.

85.     During the Class Period, the goodwill impairment testing was to be conducted via a two-step process.  The first step in the process was to identify a potential goodwill impairment, while the second step involved the measurement of the amount of impairment.  In the first step, the fair value of a reporting unit is compared to its carrying value.  If the fair value of the unit exceeds its carrying amount, then goodwill is deemed not to be impaired, and no further testing is required.  However, when the carrying value of the unit exceeds its fair value, then a second

---

[3]     This complaint references GAAP in existence during the Class Period.

step is performed to measure the amount of goodwill to be impaired.  *See, e.g*., SFAS No. 142 ¶¶17-22.

86.     Nortel's 2007 Form 10-K, which was signed by Defendants Zafirovski and Binning, affirmed Defendants' knowledge of GAAP's mandate associated with goodwill impairment, which stated, in pertinent part, as follows:

> We test goodwill for possible impairment on an annual basis as of October 1 of each year and at any other time if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount. Circumstances that could trigger an impairment test between annual tests include, but are not limited to:
>
> - a significant adverse change in the business climate or legal factors;
>
> - an adverse action or assessment by a regulator;
>
> - unanticipated competition;
>
> - loss of key personnel;
>
> - the likelihood that a reporting unit or a significant portion of a reporting unit will be sold or disposed of;
>
> - a change in reportable segments;
>
> - results of testing for recoverability of a significant asset group within a reporting unit; and
>
> - recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit.
>
> The impairment test for goodwill is a two-step process.  Step one consists of a comparison of the fair value of a reporting unit with its carrying amount, including the goodwill allocated to the reporting unit.  Measurement of the fair value of a reporting unit is based on one or more fair value measures.  These measures involve significant management judgment and as a result are subject to change.
>
> If the carrying amount of the reporting unit exceeds the fair value, step two requires the fair value of the reporting unit to be allocated to the underlying assets and liabilities of that reporting unit, resulting in an implied fair value of goodwill. If the carrying amount of the reporting unit goodwill exceeds the implied fair

value of that goodwill, an impairment loss equal to the excess is recorded in net earnings (loss).

**The fair value of each reporting unit is determined by allocating our total fair value among our reporting units** using an average of three valuation models; a discounted cash flow, or DCF, a model which is based on estimated 2007 revenue multiples, or the Revenue Multiple model, and a model based on a multiple of estimated 2007 earnings before interest, taxes, depreciation and amortization, or EBITDA, Multiple model. All of these valuation models involve significant assumptions regarding our future operating performance. The following are the significant assumptions involved in each model:

- DCF model: assumptions regarding revenue growth rates, gross margin percentages, discount rates and terminal growth rates;

- Revenue Multiple model: estimates of 2007 revenue growth and the selection of comparable companies to determine an appropriate multiple; and

- EBITDA Multiple model: 2007 projected EBITDA and the selection of comparable companies to determine an appropriate multiple.

87.     These representations were repeated in Nortel's quarterly reports for the first and second quarters of 2008, each of which was signed by Defendant Binning.

88.     During the Class Period, Nortel overstated its reported income and assets by more than **$2.379 billion** when it improperly failed to timely record an impairment in the value of its goodwill by no later than the beginning of the Class Period.

89.     As noted above, Nortel's public filings represented that it tested goodwill for possible impairment on October 1 of each year and "at any other time if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount."

90.     At the beginning of the Class Period, there were specific facts in existence indicating that the fair value of Nortel's goodwill was less than its carrying, or reported value. First, as noted in the chart below, during the five quarters immediately preceding the Class Period, Nortel's market capitalization, which represents a company's aggregate value in the

- 25 -

public marketplace, plunged by nearly **75%**, from $11.6 billion as of December 31, 2006, to $2.93 billion as of March 31, 2008:



91.     In addition, during this same time period, Nortel amassed nearly **$1.1 billion** in net losses and its operations consumed more than **$660 million** in cash.  Moreover, as detailed herein, by the beginning of the Class Period it was apparent to Defendants that Nortel's major customers had scaled back orders as demand for the Company's products plummeted.

92.     These significant circumstances indicated that the reported amount of Nortel's goodwill was impaired at the beginning of the Class Period, mandating, according to GAAP and Nortel's publicly disclosed accounting policy, that the Company's goodwill be tested for impairment.

93.     Notwithstanding these significant indicators of impairment, on May 2, 2008, the first day of the Class Period, Defendants reported that the value of the Company's goodwill was $2.57 billion as of March 31, 2008.  Defendants could not have believed, and did not believe, their representations about the reported value of Nortel's goodwill as of March 31, 2008 because, on that date, the market valued **the entire Nortel enterprise** at only $2.93 billion.  If the fair

- 26 -

value of Nortel's goodwill was, as Defendants represented, $2.57 billion as of March 31, 2008, then the market was valuing the entirety of Nortel's non-goodwill tangible and intangible assets – including its: (i) patents and patent applications; (ii) proprietary technologies; (iii) processes and know-how; (iv) in-process research and development; (v) customer relationships; (vi) trade secrets; (vii) product engineering and designs; (viii) distribution networks; and (ix) employees – at only ***$360 million*** at the beginning of the Class Period.  It is utterly implausible to conclude that only $360 million, or 12% of the Company's market capitalization as of March 31, 2008, was attributable to its entire portfolio of physical and intellectual property and 88% was attributable to its goodwill, particularly when the sale of Nortel's non-goodwill assets in 2011 generated more than ***$7.5 billion*** in proceeds.

94.     Defendants must have known, or recklessly ignored, that their representations set forth in Nortel's financial statements and in other disclosures about the Company's goodwill during the Class Period were materially false and misleading.

95.     Pursuant to the Company's publicly disclosed accounting policy for goodwill, Nortel determined the fair value of each reporting unit "by allocating ***our total fair value*** among our reporting units using an average of three valuation models."  The market established Nortel's total fair value at $2.93 billion on March 31, 2008, meaning that had Nortel tested its goodwill in accordance with its stated accounting policy, $2.57 billion of that amount would have been allocated to goodwill.

96.     Accordingly, it was readily apparent to Defendants that the value of the Company's goodwill was impaired on March 31, 2008 because it could not have been the case that the Company's non-goodwill assets totaled only $360 million on that date, particularly

because the proceeds from the subsequent sale of such assets were more than **20 times** that amount.

97.     On November 10, 2008, when Nortel announced its financial results for the quarter ended September 30, 2008, Defendants belatedly disclosed that Nortel had written off the entire $483 million goodwill balance of its Enterprise Solutions segment and the entire $659 million goodwill balance of its MEN segment – a total impairment charge of **$1.142 billion**. That impairment charge was quickly followed by the Company's write off of the entire $1.087 billion goodwill balance of its Global Services segment and the $151 million goodwill balance of its Carrier Networks segment during the fourth quarter of 2008.

98.     Indeed, the value of Nortel's goodwill could not have, and did not, suddenly go from **$2.379 billion to zero overnight**.

99.     Nonetheless, Defendants knowingly or recklessly caused Nortel to improperly delay the recognition of $2.379 billion in impaired goodwill during the Class Period.  By doing so, Defendants materially overstated Nortel's assets and operating results and misled investors about the Company's true financial condition during the Class Period.  Defendants were motivated to delay recording the goodwill impairment charge in order to enable Nortel to complete the 2016 Notes Offering on favorable terms that yielded the Company approximately $655 million in net proceeds.

## MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

### First Quarter 2008 Financial Results

100.     The Class Period begins on May 2, 2008, when Nortel issued a press release announcing its financial results for the first quarter of 2008, the period ended March 31, 2008. According to the press release, the Company's first quarter financial results "**demonstrated**

*continued progress against the Company's turnaround strategy*," and "*[s]trong operational progress* in margins combined with steady revenue growth *kept Nortel on track to meet full year goals*."  Defendant Zafirovski commented on the results, in pertinent part, as follows:

> Nortel had a strong first quarter, driven by the completion of a contract in our LG-Nortel joint venture and continued improvements in gross and operating margins. Nortel's operating margin, a critical measure of our plan's traction, expanded for the seventh consecutive quarter year over year, recording a 512 bps improvement to 4.7 percent . . . . *We expect to achieve our full year guidance and we continue to make solid progress against the strategy to turn around the company*.  Our relentless focus on execution and our determination to deliver value to customers is strengthening the foundation upon which to build our performance over the balance of 2008 and beyond.

101.    The press release also announced that Nortel had "launched the industry's first 40/100G solution" – "a significant technology milestone" that would allow its carrier customers to increase bandwidth capacity without replacing their existing networks.

102.    Finally, the press release reaffirmed Nortel's guidance for the full year 2008, stating as follows:

> Nortel reiterates its financial outlook for the full year 2008, and continues to expect:

- Revenue to grow in the low single digits compared to 2007[;]

- Gross Margin to be about the business model target of 43 percent of revenue[; and]

- Operating Margin as a percentage of revenue to increase by about 300 basis points compared to 2007[.]

103.    The statements referenced above in ¶¶100-02 were materially false and misleading at the time they were made because they misrepresented and failed to disclose the following facts, which were known to Defendants or recklessly disregarded by them:

(a)    Nortel's turnaround initiatives were not succeeding and the Company was struggling to cut costs and improve profitability;

- 29 -

(b)     demand for Nortel's products was plummeting as the Company fell behind on technological innovations and customers scaled back orders;

(c)     Nortel was improperly delaying recognizing a $2.379 billion goodwill impairment charge and as a result, Nortel's reported income and assets were materially overstated and the Company's financial results were not prepared in conformity with GAAP or the Company's own stated accounting policies, as set forth in ¶¶83-86; and

(d)     as a result of (a)-(c) above, Defendants had no reasonable basis to believe, and did not in fact believe, their full-year 2008 guidance.

104.    As a result of the foregoing, Defendants lacked a reasonable basis to state that Nortel had "demonstrated continued progress" and "continue[d] to make solid progress" with respect to the Company's turnaround strategy and had made "[s]trong operational progress," or to state that Nortel was "on track to meet full year goals" and "achieve [] full year guidance[.]" In addition, the statement referenced above in ¶101 highlighting the significance of Nortel's new 40/100G product offering was materially misleading at the time it was made because Nortel's turnaround initiatives did not include sufficient research and development programs and cut costs to the point that Nortel did not have the technological wherewithal to effectively support and continue developing its 40/100G product offering.

105.    Also on May 2, 2008, Nortel filed its quarterly report for the first quarter, the period ended March 31, 2008, with the SEC on Form 10-Q (the "First Quarter Form 10-Q"), which was signed by Defendant Binning.  The First Quarter Form 10-Q represented that Nortel's financial results were presented in conformity with GAAP and repeated the statements contained in Nortel's 2007 Form 10-K concerning goodwill impairment testing, set forth above in ¶86.

106.   The First Quarter Form 10-Q represented that Nortel's goodwill totaled $2.57 billion as of March 31, 2008, with $486 million allocated to Enterprise Solutions, $153 million allocated to Carrier Networks, $663 million allocated to MEN, $1.096 billion allocated to Global Services, and $172 million allocated to "Other."   The First Quarter Form 10-Q further stated that: "Our four reportable segments and NGS [Nortel Government Solutions Incorporated] comprise our reporting units.  As of our annual measurement date, the excess of fair value over the carrying value for each of our reporting units ranged from 9% for NGS to in excess of 74% for [Carrier Networks]."

107.   The statements referenced above in ¶¶105-06 were materially false and misleading at the time they were made because they misrepresented and failed to disclose that Nortel was improperly delaying recognizing a $2.379 billion goodwill impairment charge and as a result, Nortel's reported income and assets were materially overstated and the Company's financial results were not prepared in conformity with GAAP or the Company's own stated accounting policies, as set forth in ¶¶83-86.

108.   Later in the day on May 2, 2008, Defendants held a conference call with analysts and investors, during which they further emphasized the progress of Nortel's turnaround plans. Defendant Zafirovski commented, in pertinent part, as follows:

> *The transformation of Nortel continues.  As we enter the third year of our turn around* I consider the hard work, *the strategy and the plans which we have put in place are bearing fruit*.  We are starting the year off with a good quarter in a pretty tough macro environment.  And we remain firmly focused on achieving our 2008 objectives, which as we articulated at our last call, are to grow our business in low single-digits, to achieve [gross] margin of 43% and to grow our operating margin by 300 basis points.
>
> We continue our . . . focus on driving operating earnings growth ahead of the market, the best, which I believe the best way to measure that is the operating margin, in *continuing to build market and customer momentum*.  We do understand that customer momentum is the key elements of any strategy and we also understand that 2008 is a pivotal year for Nortel.  In particular we have made

- 31 -

significant investments in our [Metro] businesses and Enterprise businesses.  And as 2008 develops we are looking . . . to drive top and bottom line performance above the corporate averages for us.  We will keep our stable profitability in our Carrier business, as we execute on next generation technologies.  And of course we look to deliver value, add services and solutions to our customers.

\*       \*       \*

. . . *[W]e are very pleased with the continued improvement in operating excellence and functions and serving our customers.  And even more so driving up cost structure*. . . . [O]ur profitability remains . . . in double-digits.  And we're starting to see some with improvement in SG&A in this quarter and that will continue throughout 2008.

\*       \*       \*

[A] few comments with respect to the business and *customer momentum in the Carrier business*.  Very pleased with the wins with the BS&L, U.S. Cellular and Clearwire.  Also . . . we're very pleased with the progress which we're making developing our LTE technologies . . . .  *In terms of [MEN], this will be a big quarter for us.  40Gs is ready to ship as of yesterday.  And lots of excitement in the marketplace*.  So we're the first live 100G trial . . . with Comcast and we continue to see increase in the number of Carrier Ethernet trials.  We do expect revenues to ramp up in the second half of this year.

\*       \*       \*

. . . *[O]ur long-term success is ultimately based on the customers embracing our strategy* and how we deliver products, technology and solutions they require today and tomorrow.  As we've discussed before, *our strategy is focused on three areas, transforming Enterprise, next generation ability and convergence and services and solutions.  This is resonating with our customers* and we look forward to providing an updated elements of our strategy and to specific plans at the upcoming analysts day.

\*       \*       \*

. . . *[W]e believe we ha[d] very good first quarter in a tough macro environment* both from a top line but also starting to leverage . . . all of our cost.  *We are firmly focused on achieving our 2008 objectives*.  We are looking forward to drive operating margin growth ahead of the market.  *We continue to build market and customer momentum*.

\*       \*       \*

Let me say that *we are pleased with the first quarter*.  *We are very driven toward achieving the 2008 objectives*.  I [k]now there's quite a few discussions on Q2, I

- 32 -

mean *it's a very uncertain environment but we are very confident with the total year projections*. . . .

109.     During the call, when an analyst asked about customer demand in Nortel's Carrier Networks business, the following exchange occurred:

Michael Urlocker – Griffith McBurney – Analyst:

. . . Mike my question is *if you could maybe describe your sense of the wireless industry and customer demand through the year?* What you're seeing in terms of fundamentals? Certainly the GSM on Q1 was very strong. *Can you touch on whether you see continued wins due to your improved cost performance* or is this kind of a one-time blip we saw Q1? . . .

Defendant Zafirovski:

. . . *[I]n terms of the progress which we've made getting market share in CDMA*, increasing our presence in GSM with a combination of a lower product cost offering, and also (inaudible) may have to revolve (inaudible) in 4G. I mean those have been the discussions, they have been opening the door and also discussing fixed mobile conversions and services and solutions. So in totality that is . . . what has made the Carrier business much easier to go and to and market to operators . . . in a difficult environment. So *we do expect to maintain our revenues and* . . . *our attractive rate of returns for 2008*.

Michael Urlocker – Griffith McBurney – Analyst:

*And do you think wireless demand is improving or not improving*?

Defendant Zafirovski:

*It's pretty flattish overall*.

110.     The statements referenced above in ¶¶108-09 were materially false and misleading at the time they were made for the reasons set forth in ¶103. In addition, in light of Nortel's faltering turnaround initiatives, Defendants lacked a reasonable basis to state that those initiatives were "bearing fruit" and that Defendants were "very pleased with the continued improvement in operating excellence and functions[.]" Likewise, Defendants' statements that Nortel was "continuing to build market and customer momentum" and showing "continued improvement in . . . serving our customers," and that Defendants' "strategy" was "resonating

- 33 -

with [] customers" were materially false and misleading when made because Nortel was in fact experiencing a loss of customer confidence and decreased customer demand due to product quality issues, the downsizing of customer-facing areas, and spending cuts that left Nortel unable to develop new products and features that were valuable to its customers.  Moreover, customer demand in Nortel's wireless business was not "pretty flattish overall," but was declining as customers scaled back orders.  For example, by May 2008, Nortel was experiencing reduced demand from Verizon and AT&T, its two largest customers, and another major customer, Sprint, had announced that it would not order any additional equipment from Nortel during 2008.  Furthermore, the statement referenced above in ¶108 highlighting the "excitement in the marketplace" and revenue potential surrounding Nortel's 40/100G product launch in its MEN segment was materially misleading at the time it was made because Nortel's turnaround initiatives did not include sufficient research and development programs, and cut costs to the point that Nortel did not have the technological wherewithal to effectively support and continue developing its 40/100G product offering.  As a result of the foregoing, Defendants had no reasonable basis to be (and were not) "very confident [in] the total year projections."

**5/7/08 Annual Shareholder Meeting and 5/21/08 Press Release**

111.   The following week, on May 7, 2008, speaking at Nortel's annual shareholder meeting, Defendant Zafirovski highlighted Nortel's "***progress against [its] business transformation plan*** and discussed the Company's "***growing momentum with customers***." According to Nortel's press release entitled "Nortel CEO Outlines Progress at Annual Shareholder Meeting," Defendant Zafirovski stated, in pertinent part, as follows:

> ***We have been hard at work transforming Nortel to return it to industry leadership*** – to re-create the great company that we all know Nortel is capable of being: a company that can consistently deliver value to customers, shareholders and employees . . . . ***Every day, we are taking steps toward remaking Nortel into an industry powerhouse***.

- 34 -

Building Nortel for the future requires focusing not only on technology but on customer needs and operational excellence . . . .

We see a big opportunity to step forward and become the "voice of the customer" within communications and technology markets by driving innovation in ways that solves our customers' biggest challenges . . . . *We are turning customer focus into a competitive advantage by improving satisfaction and influencing purchasing behavior*.

Not just in our labs, but in the marketplace and with our customers today *we are driving innovations in unified communications and wireless broadband; innovations in 40G*, which increases bandwidth without ripping up and replacing existing networks.

*      *      *

*Nortel is not only addressing customer needs through innovation, but through operational initiatives as well.  Nortel has launched almost 200 Lean Six Sigma projects designed to reduce costs and differentiate itself from the competition.*

*Nortel's growing momentum with customers is evidence of progress against the company's business transformation plan . . . . Our customer engagements are proving our relevance and momentum.  A new Nortel has emerged and we have the traction to prove it.*

112.    According to the press release, Defendant Zafirovski "explained that *Nortel has made solid financial progress that the company [can] build upon in 2008*."   Zafirovski commented, in relevant part:

The leadership team sees the potential of this company and I believe, *more than ever, that we are on the right path today and are rebuilding our company in the right way*.

*We have improved employee and customer satisfaction.  We have made progress on our business transformation plan and customers are coming on board . . . . In 2008, we will continue the progress we've made but faster, deeper and more effectively through accelerated execution*.

113.    The statements referenced above in ¶¶111-12 were materially false and misleading at the time they were made for the reasons set forth in ¶103.  In particular, Nortel had not "made progress on [its] business transformation plan" or "made solid financial progress" because Defendants' turnaround initiatives were faltering.  Likewise, Defendants' statements that

Nortel was experiencing "growing momentum with customers," had "improved . . . customer satisfaction," and that customers were "coming on board" were materially false and misleading when made because Nortel was in fact experiencing a loss of customer confidence and decreased customer demand due to product quality issues, the downsizing of customer-facing areas, and spending cuts that left Nortel unable to develop new products and features that were valuable to its customers.  In addition, Nortel's "almost 200 Lean Six Sigma projects" were not "addressing customer needs," but rather, were hindering the Company's turnaround.  Finally, Nortel's turnaround initiatives did not include sufficient research and development programs, and cut costs to the point that Nortel did not have the technological wherewithal to "driv[e] innovations in unified communications[,] . . . wireless broadband" and "40G[.]"

114.  On May 21, 2008, Nortel issued a press release reconfirming its full year outlook, which stated as follows:

Nortel . . . continues to expect:

- Revenue to grow in the low single digits compared to 2007[;]

- Gross Margin to be about the business model target of 43 percent of revenue[; and]

- Operating Margin as a percentage of revenue to increase by about 300 basis points compared to 2007[.]

115.  The statements referenced above in ¶114 were materially false and misleading at the time they were made for the reasons set forth in ¶103.

**2016 Notes Offering**

116.  Also on May 21, 2008, Nortel issued a second press release announcing a proposed private placement offering of $500 million worth of 10.75% senior unsecured notes due 2016.  According to the press release:

. . . [Nortel] today announced that its principal direct operating subsidiary, Nortel Networks Limited ("NNL"), has commenced a proposed US$500 million offering of 10.750% senior unsecured notes due 2016 (the "Notes") in the United States to qualified institutional buyers pursuant to Rule 144A under the U.S. Securities Act of 1933 . . ., and to persons outside of the United States pursuant to Regulation S under the Securities Act . . . . The Notes to be issued by NNL would be fully and unconditionally guaranteed by Nortel . . . and initially guaranteed by [Nortel's] indirect subsidiary, Nortel Networks Inc.

The Notes would be issued as additional notes under an existing indenture and would be part of the same class as NNL's currently outstanding $450,000,000 aggregate principal amount of 10.750% senior notes due 2016 that were issued on July 5, 2006.

Nortel plans to use the net proceeds, together with available cash, to redeem at par $500 million outstanding principal amount of NNC's 4.25% convertible senior notes due 2008, of which $675 million principal amount are currently outstanding.   [Nortel] intends to issue a redemption notice with respect to that amount of 2008 convertible notes after the closing of the proposed offering and may redeem the balance of the outstanding principal amount of the 2008 convertible notes prior to their maturity on September 1, 2008.

117.   On May 28, 2008, Nortel issued a press release announcing the successful completion of the 2016 Notes Offering.  The press release stated that the aggregate principal amount of the 2016 Notes Offering had been increased to $675 million, and Nortel expected to realize net proceeds of approximately $655 million, which would enable the Company to redeem the entire outstanding principal of 4.25% convertible senior notes due September 1, 2008.

118.   Following the 2016 Notes Offering, a Paradigm Capital analyst report dated June 6, 2008 noted that "[t]he company has proactively refinanced near term debt maturing in 2008 and appears well prepared for normal course working capital requirements and much more" since "[t]he next major debt maturity doesn't come until 2011."  The analyst report concluded that Nortel's "[b]alance [s]heet is [s]olid" as "[t]he Company ended Q3 with $3.3b in cash[.]"

**6/11/08 Investors' Day**

119.   On June 11, 2008, Nortel issued a press release discussing the "day-long meeting in Toronto with the investment community" that Nortel was holding that day (the "Investors'

Day"), during which Defendant Zafirovski "and members of the senior leadership team [would] provide an update on the [C]ompany's transformation."  According to the press release, at the Investors' Day:

> Executives will review the achievements of the past two years to build ***the operational and execution capabilities required to compete and win in a rapidly changing market***.  Of note, they will discuss how ***this fundamental phase of the transformation was accomplished while delivering consistent margin improvements that go against industry trends***.  The Nortel team will also explain how ***this strengthened foundation, along with the company's growing market relevance, will be leveraged to capture profitable new revenue opportunities in growth segments of the market***.

120.  The press release also "reconfirmed [Nortel's] full year 2008 outlook[,]" stating that the Company "continues to expect:"

- Revenue to grow in the low single digits compared to 2007[;]

- Gross Margin to be about the business model target of 43 percent of revenue[; and]

- Operating Margin as a percentage of revenue to increase by about 300 basis points compared to 2007[.]

121.  The statements referenced above in ¶¶119-20 were materially false and misleading at the time they were made for the reasons set forth in ¶103.  As a result of the foregoing, Defendants lacked a reasonable basis to state that a "fundamental phase of the transformation [had been] accomplished," and that Nortel had a "strengthened foundation" and "growing market relevance[.]"  In addition, Nortel did not have the "operational and execution capabilities required to compete and win in a rapidly changing market" and was not in a position to "capture profitable new revenue opportunities in growth segments of the market" because the Company's turnaround initiatives did not include sufficient research and development programs, and cut costs to the point that Nortel was unable to develop new products and product features that were valuable to its customers.

122.    In his opening remarks at the Investors' Day, Defendant Zafirovski positively described the progress of Nortel's turnaround initiatives and the Company's business and prospects, stating, in pertinent part, as follows:

We believe ***there [are] significant assets, capabilities, [and] customer relationships for us to be able to grow***.

\*       \*       \*

We believe ***there is momentum internally and externally*** . . . . ***[T]he cost structure has improved substantially*** . . . .

\*       \*       \*

Overall, [in] the key financial measurements, ***solid progress has been made over the past 24 months*** . . . ***on*** . . . ***revenues, margins, operating margins, and operating cash flow.  And I want to take this opportunity to confirm the guidance for the year***.

We do ***expect ending cash to be pretty comparable to cash at the beginning of the year***.

\*       \*       \*

We do believe that ***the actions which we have taken and are taking will provide a meaningful upside . . . for investors***.

\*       \*       \*

***Quality is up*** . . . ***the productivity numbers [are] off the charts***.

\*       \*       \*

***We are investing much more for growth***.

\*       \*       \*

The amount of money [invested] in training programs and hiring programs for the company is unprecedented.

\*       \*       \*

***[W]e're transforming R&D*** . . . ***our lean six sigma [programs are] driving quality growth and productivity***.

\*       \*       \*

*[W]e're very confident that productivity will continue for [a] foreseeable number of years . . . [with] the related . . . operating margin improvement.*

\*     \*     \*

In terms of growth, *Enterprise has been one of the areas where investments are starting to show up on the top line. . . . For 2008 and beyond, we believe we have positioned Enterprise for top and bottom line growth. . . . 2008 . . . will be a good demonstration of our progress.*

\*     \*     \*

*[In] Enterprise, you can see . . . some of the customers that are coming our way . . . .*

\*     \*     \*

*[In] Enterprise and Metro Ethernet, . . . we expect growth in double digits, and a very, very significant increase in profitability.* Both of those segments have had increased investment over the last couple years. So even without acquisitions we've been able to make investments, which very few companies can do. *And now we're expecting the growth to start both on [the] top and bottom line[s].*

123. Similarly, Defendant Binning made positive statements about Nortel's financial condition and prospects, stating, in pertinent part, as follows:

Whichever metric you look at, *there's no doubt that we've made great progress over the last two years. Our focus is to continue to build on this as we move forward.* And what we're doing in the business is driving every line of the profit and loss and cash flow.

\*     \*     \*

. . . As we move forward, *we do expect to see further improvements in productivity.* In addition we are focusing on other areas in terms of reducing complexity. . . . But *moving forward our objective is for gross margins to be at or above our target level of 43%.*

\*     \*     \*

*Our focus* as we move forward *is obviously on revenue growth, operating margin, and importantly, free cash flow generation. The business model is achievable*, but we have to deliver on revenue growth and cost reduction at the same time to get there. And *the team is committed to driving performance for the business and is absolutely focused on value creation.*

- 40 -

124.     Defendants also disseminated the following slide highlighting Nortel's long-term growth projections and the "[s]ignificant, [p]rofitable [g]rowth [o]pportunities" for each of its business segments:



| **NORTEL** | | | | |
| --- | --- | --- | --- | --- |
| **TARGET FINANCIAL OBJECTIVES** | | | | |
| (including Associated Services) | **FY 2007** | | **2007 - 2011 Rev CAGR Target** | **2011 OM% Target** |
| | Rev % of Total | OM% | | |
| Carrier Networks | 52% | 18% | Flat | 14-17% |
| Wireless | 36% | 24% | (3%) | 13-16% |
| Core Multimedia /Applications | 16% | 4% | 8% | 16-19% |
| Enterprise Solutions | 28% | 2% | 12% | 12-16% |
| Metro Ethernet | 18% | 5% | 10% | 16-19% |
| **Significant, Profitable Growth Opportunities** | | | | |

Source: Nortel

125.     The statements referenced above in ¶¶122-24 were materially false and misleading at the time they were made for the reasons set forth in ¶103.  In addition, Nortel was not "investing . . . for growth" because the Company's turnaround initiatives did not include sufficient research and development programs, and cut costs to the point that Nortel was unable to develop new products and product features that were valuable to its customers.  Indeed, Nortel had not made "great progress" and was not experiencing "momentum internally and externally" because Defendants' turnaround initiatives were faltering.  Moreover, Nortel's "lean six sigma [programs]" were not "driving quality growth and productivity," but rather, were hindering the Company's turnaround.  Furthermore, Nortel's "productivity" was not "off the charts," or poised to "further improve[]" and "continue for [a] foreseeable number of years" because the

Company's business was plagued by persistent operational problems, inefficient operating systems, and difficulties and delays implementing the SAP system. Finally, "quality" was not "up" because Nortel was suffering from product quality issues, and customer complaints due to quality problems were prevalent. As a result of the foregoing, Defendants had no reasonable basis to expect (and did not expect) "growth in double digits, and a very, very significant increase in profitability" in the Enterprise and MEN segments, and did not believe their statements again "confirm[ing] the guidance for the year" and projecting long-term "[s]ignificant, [p]rofitable [g]rowth [o]pportunities" for each of the Company's business segments.

126.    In addition, Defendant Binning assured investors that Nortel's capital and liquidity, which had recently been strengthened by the 2016 Notes Offering, were more than sufficient for implementing the Company's turnaround initiatives. Defendant Binning stated, in relevant part:

> Let me move on to our capital structure. You all know that *we completed the refinancing of the $675 million in May*. The considerations that we took into account when we did that refinancing were, given where we were in our overall turnaround plan, given the economic environment, the credit markets, etc. *it was important for us to have a strong cash balance as we move forward into the next phase of our development. A number of you in this room had highlighted liquidity as an issue to me*, particularly given the economic environment that's out there at the moment. *What the refinancing has done is taken this issue off the table, and it certainly gives us a degree of financial flexibility as we move forward*. . . . *[O]ur next maturity is not until July 2011*.

127.    Defendant Binning's statement referenced above in ¶126 that the 2016 Notes Offering had "taken" the "issue" of Nortel's "liquidity" "off the table" was materially false and misleading at the time it was made because the Company's liquidity remained a serious concern internally, and in truth, Nortel's cash balance was not "strong" but was rapidly declining and the

Company lacked the "financial flexibility" to effectively implement Defendants' turnaround initiatives.

128.    During the Investors' Day, Defendant Zafirovski commented on Nortel's relationship with AT&T, one of its largest customers, as follows:

> Two comments on AT&T . . . . I think they would tell you **the relationship right now on the sales side is outstanding**. . . . The challenge there is that within AT&T in particular . . . can we be relevant? . . . **The CEO from AT&T he could not have been more complimentary as to what's being done**. . . . [I]f we stay with our focus on carrier voice over applications and optical, **we'll become very relevant to them, pretty much in the very near future**.

129.    Defendant Zafirovski's statement referenced above in ¶128 concerning Nortel's relationship with AT&T was materially false and misleading at the time it was made because AT&T had announced at the beginning of 2008 that it was reducing forecasted capital expenditures for 2008 and had decreased its orders from Nortel by approximately 50% year-over-year during the first half of 2008.  Consequently, Nortel was not poised to "become very relevant to" AT&T "in the very near future."  In addition, Nortel's "relationship" with AT&T "on the sales side" was not "outstanding" because the Company's customer relationships, including its relationship with AT&T, were being harmed by product quality issues, the downsizing of customer-facing areas, and spending cuts that left Nortel unable to develop new products and features that were valuable to its customers.

130.    Finally, in his closing remarks at the Investors' Day, Defendant Zafirovski stated, in pertinent part, as follows:

> . . . [There are] **three things that we will achieve in this uncertain environment. One, that we will accelerate the market and customer momentum**.  You heard . . . that we have marquee customers, and how important they are . . . . **We do believe we will outpace market growth in any segment**. . . . So **the growth which we showed you earlier today, [is] based on pretty significant investments**. . . . We made some pretty significant organic investments, . . . and **we believe that those investments . . . will pay off**.

- 43 -

*Second, that we would drive earnings growth ahead of the market* . . . . *The foundation of our productivity is strong.  It's only going to continue*.

\*     \*     \*

*And* . . . *number three, that we'll continue to make progress on the fundamental health of the company*.  I mean *three things, focused technology investments*, the opportunity is greater, but we're not springing into too many unknown areas, *accelerate our marketing and market reach* . . . *that's gaining real traction*. . . . And last and *most important, we've made a great level of investment and care in people developing motivation, training programs*, but also putting the people that achieve into the big positions. . . . *Those three elements are positioning us to do well in the next area for the company*.  The starting point, we all know where it was.  *The foundation is much firmer, and frankly I feel very comfortable that this can be a growth company*.

\*     \*     \*

It's music to my ears when people ask, well how do you maintain double digit operating margin? . . . [And I say,] watch me, I'll beat those numbers. . . .

\*     \*     \*

*There's a great level of interest from top tier companies looking at Nortel with a very different view* than where we were . . . .

\*     \*     \*

I really think this is *where the company is today* . . . *a very healthy combination of assets, capabilities and trends* . . . *[and a] customer base second to none* . . . . You're starting to see some of the elements of how we're putting things together, some customer examples from advertisements . . . . On balance, we like where we are, and *there's a good healthy confidence, and lots of resolve* to take all the skepticism and negativity from many places and *to demonstrate what this company can deliver in the future*. . . . Last comment, *we are confident in the prospects for [the] Company*.  Thank you.

131.    The statements referenced above in ¶130 were materially false and misleading at the time they were made for the reasons set forth in ¶103.  In particular, in contrast to Defendants' statements that "top tier" customers were "looking at Nortel" with "a great level of interest," that the Company's "market reach" was "gaining real traction," and that Nortel had a "customer base second to none," Nortel was in fact experiencing a loss of customer confidence and decreased customer demand due to product quality issues, the downsizing of customer-

facing areas, and spending cuts that left Nortel unable to develop new products and features that were valuable to its customers.  In addition, the "foundation of [Nortel's] productivity" was not "strong," and its productivity was not poised "to continue" because the Company's business was plagued by persistent operational problems, inefficient operating systems, and difficulties and delays implementing the SAP system.  As a result of the foregoing, Defendants lacked a reasonable basis to state that Nortel would be able to "accelerate [] market and customer momentum," "outpace market growth in any segment" and "drive earnings growth ahead of the market[.]"  Likewise, Defendants lacked a reasonable basis to describe Nortel's business as "a very healthy combination of assets, capabilities and trends," to state that they were "very comfortable that" Nortel could "be a growth company," or to express "confiden[ce] in the prospects [of the] Company."

132.    In response to Defendants' positive statements during the Investors' Day about the progress of Nortel's turnaround initiatives, the Company's share price rose nearly 12%, from a closing price of $8.11 per share on June 10, 2008, to close at $9.20 per share on June 11, 2008. Nortel's share price continued to climb as analysts who had attended the Investors' Day issued favorable reports reflecting Defendants' positive statements, reaching a Class Period high of $10.21 per share on June 17, 2008 – a total increase of 20.5%.

133.    For example, a June 12, 2008 Credit Suisse analyst report noted that Nortel had "made progress in its efforts to remake and reposition its business to address higher growth and higher profitability markets[,]" and a June 12, 2008 Jefferies & Company, Inc. analyst report observed that "[c]learly, Nortel has made significant progress in improving its margin structure and restructuring the business[.]"

134.    A June 12, 2008 JPMorgan analyst report upgraded Nortel stock from neutral to overweight  based on "[r]enewed [c]onfidence" in the Company's operating margin targets and product cycles for the second half of 2008, and observed that "the company's 4-year SAP implementation is finally complete[.]"  Likewise, a Lehman Brothers analyst report opined that "management is executing solidly to stimulate top line and margin growth, and we sense management is optimistic about its ability to achieve its targets[,]" and concluded that "investors are encouraged by the recent tangible momentum[.]"

135.    Similarly, a June 12, 2008 Paradigm Capital Inc. analyst report stated that "[w]e were most impressed by the impact of the new Business Transformation Team" which was "radically streamlining the operations at Nortel[,]" and observed that the Company's projections for its Enterprise Solutions and Metro Ethernet Networks business segments "were explained . . . and supported with excruciating detail, which lead[s] us to believe the shift is well underway."

136.    Additionally, a TD Newcrest analyst report issued the same day, entitled "Nortel is Making a Comeback," stated that "[w]e walked away with more confidence in the management team, and we heard a lot of detailed information that backs up management's plan to dramatically boost operating margin."  Citing "the tremendous momentum" in Nortel's Enterprise Networks business and "very strong" 40/100G technology in the Metro Ethernet Networks business, the report noted that "[w]e have never before seen Nortel possess such strong focus on profitable execution of its business plan," reiterated TD Newcrest's "buy" rating and $13 price target, and concluded that "[w]e remain bullish on Nortel following the company's Analyst Day."

**Second Quarter 2008 Financial Results**

137.    On August 1, 2008, Nortel issued a press release announcing its financial results for the second quarter of 2008, the period ended June 30, 2008.  According to the press release,

Nortel's second quarter financial results "*demonstrat[ed] continued progress against the Company's financial targets*[,]" enabling the Company to "*[m]aintain[] [its] full year guidance*" despite "an increasingly challenging business environment."   Commenting on the results, Defendant Zafirovski stated, in pertinent part:

> Nortel's financial performance in the first half of 2008 has been consistent and disciplined.  *We have achieved our objectives and are on track to meet our targets for the year*. . . . *In the second quarter, the company* focused on the work at hand and *improved productivity, stepped-up cost reduction activities* and enhanced margin performance.
>
> *       *       *
>
> *We continue to see strong customer momentum in key growth areas of our business*.  In recent months, we've signed a comprehensive global managed services telepresence agreement with Deloitte, have secured approximately 20 wins for our innovative 40G offering, and earlier this week signed on as the official network infrastructure partner for the London 2012 Olympic and Paralympic Games . . . . *In the second half*, faced with a challenging business environment, *we will continue our focus on execution and on delivering accelerated growth in key segments in order to achieve our financial objectives for the year*.

138.   With respect to the Company's outlook, the press release stated, in relevant part:

> Nortel faces a challenging business environment with increasing risk due to general macro-economic weakness, continuing competitive pressures and potential of further reduced capex spending by key North American CDMA customers.
>
> Accelerated growth in Nortel's Enterprise and [MEN] businesses in the second half and the expected completion of wireless contracts in the fourth quarter, representing approximately $350 million of previously deferred revenue, are key to the [C]ompany achieving its financial objectives for this year.
>
> In the context of the foregoing, *Nortel reiterates its financial outlook for the full year 2008, and continues to expect*:
>
> - Revenue to grow in the low single digits compared to 2007[;]
>
> - Gross Margin to be about the business model target of 43 percent of revenue[; and]

- 47 -

- Management Operating Margin as a percentage of revenue to increase by about 300 basis points compared with 2007[.]

139.    The statements referenced above in ¶¶137-38 were materially false and misleading at the time they were made for the reasons set forth in ¶103.  In addition, Nortel had not "improved [its] productivity" because the Company's business was plagued by persistent operational problems, inefficient operating systems, and difficulties and delays implementing the SAP system.  Moreover, Nortel was not experiencing "strong customer momentum in key growth areas of [the] business," but was in fact experiencing a loss of customer confidence and decreased customer demand due to product quality issues, the downsizing of customer-facing areas, and spending cuts that left Nortel unable to develop new products and features that were valuable to its customers.  As a result of the foregoing, Nortel was not "on track to meet [its] targets for the year" and Defendants had no reasonable basis to "reiterate[]" Nortel's "financial outlook for the full year 2008[.]"

140.    Also on August 1, 2008, Nortel filed its quarterly report for the second quarter, ended June 30, 2008, with the SEC on Form 10-Q (the "Second Quarter Form 10-Q"), which was signed by Defendant Binning.  The Second Quarter Form 10-Q represented that Nortel's financial results were presented in conformity with GAAP and repeated the statements contained in Nortel's 2007 Form 10-K concerning goodwill impairment testing, set forth above in ¶86.

141.    The Second Quarter Form 10-Q represented that Nortel's goodwill totaled $2,568 billion as of June 30, 2008, with $486 million allocated to Enterprise Solutions, $153 million allocated to Carrier Networks, $663 million allocated to MEN, $1.095 billion allocated to Global Services, and $171 million allocated to "Other."  The Second Quarter Form 10-Q further stated that: "Our four reportable segments and NGS [Nortel Government Solutions Incorporated] comprise our reporting units.  As of our annual measurement date, the excess of fair value over

the carrying value for each of our reporting units ranged from 9% for NGS to in excess of 74% for [Carrier Networks]."

142.    The statements referenced above in ¶¶140-41 were materially false and misleading at the time they were made because they misrepresented and failed to disclose that Nortel was improperly delaying recognizing a $2.379 billion goodwill impairment charge and as a result, Nortel's reported income and assets were materially overstated and the Company's financial results were not prepared in conformity with GAAP or the Company's own stated accounting policies, as set forth in ¶¶83-86.

143.    Later in the day on August 1, 2008, Defendants held a conference call with analysts and investors, during which they continued to make positive statements about Nortel's business and highlight the purported progress of the Company's turnaround initiatives. Defendants commented, in pertinent part, as follows:

Defendant Zafirovski:

. . . I do believe **we are making good progress in the first half** in a pretty tough environment, which is generally out there for the industry.  **We remain very focused on achieving our 2008 objectives**, and to repeat those, **to grow our business for the year in low single digits, to achieve a gross margin of 43%, and to grow our management operating margin by 300 basis points.  We continue our unrelenting focus to drive earnings growth ahead of the market, and to continue to build markets and customer momentum in the growth areas**, which we discussed with you at Analyst Day.  [In] [b]rief, **we are driving meaningful revenue and management operating margin expansion in the enterprise businesses**, including the related services.

This is the goal for 2008, **we expect a ramp-up in the second half, and also to optimize the results in our Carrier business, particularly in wireless**, as we execute in the transition to maturation of the technology. . . . **We are pleased with the performance this quarter**. Our Q2 revenues were 2% higher than last year, benefiting from the completion of the deferred revenues released in our Carrier business.

*        *        *

- 49 -

Moving on to the business momentum, ultimately financial momentum is driven by . . . business momentum, operational excellence, and world class cost structure. *I am very comfortable that we are making real traction* on the last two, *on operational excellence and a world class cost structure. We are starting to see real momentum in our business from our customers, particularly in the growth areas*.

\*       \*       \*

*In the [MEN] business, we have 20 wins, five or six more since we saw you a few months ago, and very important five Tier 1 trials*. *A pretty significant* . . . *carrier award from Verizon earlier in the quarter*. *Services and Solutions are also taking hold with customers*. . . . One we are particularly pleased with, Deloitte Managed Global Telepresence Services.

\*       \*       \*

Of course in this environment, *we are increasing cost controls across the board*, and you will see some of those results already in the Q2 financials, and of course *we look forward to continue to increase the focus on costs, while driving the strategic initiatives for the business*.

In summary, *I am pleased with our business financials for this quarter*.

Defendant Binning:

. . . We are continuing to get efficiencies by moving from high cost to low cost countries, and *balancing that with investments in key programs that will drive our future growth*. R&D is expected to be lower in the second half of the year relative to the first half, with *continued investments in key programs*.

Defendant Zafirovski:

. . . *We are moving now from the transformation stage to a growth stage*, it is not going to be easy. This is the logical next step.

\*       \*       \*

. . . [L]et me provide some additional context on what we are doing to deliver [in the] second half 2008. *The Company is fully energized and engaged to delivery in this environment*. Starting with refocused sales efforts . . . [and] *increased resources to drive 40 Gig Unified Communications*.

\*       \*       \*

We are seeing increasing momentum with SI. *We are targeting our sales efforts into the areas where we do expect to see significant growth, accelerating our [MEN] solution adoptions* of revenue ramp. As I have indicated, we saw some of

- 50 -

the anticipated growth in top and . . . bottom line in MEN in the second quarter, and . . . the sales force [is] driving this with an additional level of energy in the second half of this year.

***The combination of going from trials to wins with our Tier 1 customers****. **Expanding the application for the 40 gig offerings, and increased focus on our Carrier Ethernet . . . offerings***.  In this environment we need increased focus on cost control.  ***We continue to drive lower SG&A across the Company***.

*       *       *

Let me just finish . . . with [our] ***unrelenting focus to continue to drive achieving our 2008 objectives***.  Again operating margin improvement ahead of the market. ***To build the customer and market momentum in the areas where we are making the investments in growth***, which we know we are going to have to achieve, to be able to not only finish 2008 strong, but build a foundation for 2009. ***We are just starting to move from the transformation stage, to one where we are growing the business***.  We understand our markets, we understand the industry, we know the headwinds facing us and the industry, but also ***I want to highlight that we feel confident***, by the management demanding following standards, and we are projecting to do this right.

*       *       *

***. . . [W]e are pleased with the second quarter and the year-to-date performance. We know what has to happen in the second half for us to be able to deliver guidance***.  We understand the questions facing us for 2009 and beyond, and we have tried to obviously anticipate those internally with our Board and the management team.  There was background to the Analyst Day.  ***We understand the economy is not getting easier***.  ***This is a strategy that is based very much on our capabilities and our right to play for the customers and technologies, and from relevance, and we are excited to be able to demonstrate the rest of this year our ability to deliver***.  Thank you.

144.    In response to questioning from analysts, Defendants repeatedly reassured the market that Nortel would be able to attain its full-year guidance.  The following exchanges occurred:

Gus Papageorgiou – Scotia Capital – Analyst:

. . . Nice to see that most of your businesses in this quarter were profitable.  But the Enterprise still didn't have a positive EBIT margin.  I was wondering, ***as we go into the second half, how confident are you that*** . . . ***Enterprise gets into profitable territory, and how dependent is your year going to be on that actually happening?***

- 51 -

Defendant Zafirovski:

. . . To answer your question, **we do expect both top and bottom line improvements in the Enterprise business in the second half, including those specifically to have a meaningful management operating margin profitability in the second half.  That is very much part of our plan in the guidance.  There is lots of** efforts and **confidence in the team that they will be able to deliver**.

\*       \*       \*

Mark Sue – RBC Capital Markets – Analyst:

Mike, what are the headwinds in the CDMA segment taking another leg down? **Why not be a little more prudent in terms of your guidance?**  I am not sure declining orders in deferred revenues help.  **Aside from the 350 million, where is the other incremental strength coming from**, and can 3Q be down sequentially, or should we expect flat trends and then a sharp spike at 4Q?

Defendant Zafirovski:

**I mean, we obviously have taken a very close look at the markets in terms of what is happening in all of the business segments, not just the Carrier, and those things are reflected in the guidance** for us to have the Q2 improvements.  Not only for Q2, but also the basis for 2009, the headwinds in the business, **the Enterprise business is going to have to start delivering.  We have made significant investments in the last 18 to 24 months**.

\*       \*       \*

Defendant Binning:

It is a good question.  The 350 million [in deferred revenue], obviously, is an important factor in Q4.  As Mike has highlighted, **Enterprise and MEN, we have been investing heavily throughout last year, and indeed this year**.

**There is without [a] doubt confidence that the trajectory that we are trying to build is beginning to emerge.  We can see the early signs of that in the pipeline**.  So I think, **certainly we have reiterated the guidance to date, and we wouldn't have done that if we hadn't felt confident about achieving it**.

\*       \*       \*

Ehud Gelblum – JPMorgan Chase & Co. – Analyst:

. . . One last thing if I could just bring in **with CDMA weaker and the guidance intact**, maybe I missed this.  **Are there stronger parts that are making up for the CDMA weakness, to allow us to have the same revenue growth versus your prior guidance?**

- 52 -

<u>Defendant Zafirovski</u>:

> . . . ***We have thorough discussions with all our businesses, and it gives us the confidence to confirm the guidance***, as we have said a number of times on this phone call, ***what will have to happen in the second quarter is the Enterprise and the business is to deliver per expectations and we are confident that that will happen***.

145.   The statements referenced above in ¶¶143-44 were materially false and misleading at the time they were made for the reasons set forth in ¶103.  In addition, Defendants lacked a reasonable basis to state that Nortel was "making good progress," "making real traction . . . on operational excellence and a world class cost structure," and "moving [] from the transformation stage to a growth stage," and that "[t]here is without [a] doubt confidence that the trajectory that we are trying to build is beginning to emerge," because Defendants' turnaround initiatives were faltering.  Moreover, Nortel was not "starting to see real momentum . . . from [its] customers," but was in fact experiencing a loss of customer confidence and decreased customer demand due to product quality issues, the downsizing of customer-facing areas, and spending cuts.  Likewise, Defendants' statements highlighting customer "wins" in the MEN business, stating that Nortel was accelerating [its] [MEN] solution adoptions," and representing that Nortel was "balancing" cost-cutting measures with "continued investments in key programs" were materially misleading at the time they were made because Nortel's turnaround initiatives did not include sufficient research and development programs, and cut costs to the point that Nortel did not have the technological wherewithal to effectively support and continue developing its 40/100G product offering, and was unable to develop new products and product features that were valuable to its customers.  As a result of the foregoing, Defendants lacked a reasonable basis to believe (and did not believe) their statements concerning Nortel's 2008 guidance, including Defendant Binning's statement that "certainly we have reiterated the guidance to date, and we wouldn't have done that if we hadn't felt confident about achieving it," and Defendant

- 53 -

Zafirovski's statement that "[w]e have thorough discussions with all our businesses, and it gives us the confidence to confirm the guidance[.]"

### The Truth Gradually Emerges

146.    During the August 1, 2008 conference call, under questioning from analysts, Defendant Zafirovski admitted that one of Nortel's Carrier Networks customers had "shut the door on short-term capital expenditures," but failed to disclose the widespread, long-term nature of the decline in orders that Nortel had been experiencing, stated that Nortel's guidance took the customer's spending freeze into account, and insisted that Nortel was not losing market share:

Edward Snyder – Charter Equity Research – Analyst:

. . . Mike, if you look over this quarter's performance, it looks like you have executed very well along your operational aspects.  With the one exception that the *CDMA was particularly weak*.  The cost controls are all kicking in.  The question is *given the size of that division, is the weakness you are seeing in CDMA just the economy in the US, or are you seeing some of your bigger customers shift to less investment* and looking forward to LTE, or is it more of a strategic change in investment, that we can expect to weave through the next year or so, and just a weak growth or no growth, and the declines in actual revenue?

Defendant Zafirovski:

It is a great question.  *Certainly there is a capital constraint to this environment*.  Capital increased emphasis, including what we are doing internally without capital expenditures.

Some of it is the economy if you will, but also without mentioning specific customers, I mean, *there is a significant North American customer that has certainly . . . shut the door on short-term capital expenditures, and there is not much visibility what is going to happen in the next 3, 6, 9 months*.  We are having discussions with them on an ongoing basis.  But no firm commitments, and we have taken those, *we have taken those more conservative views in our guidance for the last six months of this year*.

*       *       *

Richard Windsor – Nomura Securities – Analyst:

. . . *I was wondering if you could comment on your market share in CDMA during the quarter?  Did you actually take market share, or did you lose market share? . . .*

- 54 -

<u>Defendant Zafirovski</u>:

The market share is quarter by quarter not necessarily reflective of the overall transfer. ***Certainly over the last couple years we have gained market share. We certainly do not expect to lose market share in 2008***, is probably the most appropriate answer. . . .

147.    In response the disclosure of a "short-term" spending freeze by one of Nortel's Carrier Networks customers, the price of Nortel common stock declined $1.12 per share, or more than 14%, from a closing price of $7.64 per share on July 31, 2008, to close at $6.52 per share on August 1, 2008, on heavy trading volume.  However, Defendants' misleading reassurances and continued positive statements about the Company's business prevented a more substantial decline in Nortel's stock price.

148.    Summarizing the market's reaction to Nortel's August 1, 2008 announcements, an Independent International Investment Research PLC analyst report dated August 4, 2008 noted that "Nortel . . . experienced a significant decline in its stock price, attributable to . . . an announcement by Mike Zafirovski . . . that one of its customers in North America had 'shut the door' on capital spending in the near term.  However, in view of [m]anagement's unchanged FY 2008 guidance despite a challenging environment and expected operational improvements, we do not anticipate a change in our current rating for Nortel's NYSE common stock" and "maintain our positive outlook."

149.    Just six weeks later, on September 17, 2008, Nortel issued a press release announcing that the Company had "***revised its full year 2008 outlook***" due to "***significant pressure as Carrier customers cut back their capital expenditures further than previously expected and certain Enterprise and [MEN] customers defer new IT and optical investments***." According to the press release, Nortel now expected: (i) "[r]evenue to decline between two and four percent" year-over-year, compared to previous guidance of revenue growth in the low single

- 55 -

digits; (ii) "[g]ross [m]argin of approximately 42 percent of revenue[,]"compared to previous guidance of gross margin of approximately 43 percent of revenue; and (iii) "[m]anagement [o]perating [m]argin as a percentage of revenue to improve 125 to 175 basis points" year-over-year, compared to previous guidance of an improvement of approximately 300 basis points.

150.    The press release also announced that Nortel was engaging in "[a] ***comprehensive review of [its] business***" and that "***planning [was] underway for further restructuring and other cost reduction initiatives*** . . . as well as to mitigate the risks associated with the Company's 4th generation carrier wireless investments."   In addition, Nortel "announced its intention to explore a divestiture of its Metro Ethernet Networks (MEN) business," which included the 40G/100G optical networking technology that the Company had launched at the start of the Class Period and had repeatedly highlighted as an important source of future revenue growth. According to the press release, while "the MEN business [was] a premium asset with a highly differentiated offering[,]" its sale was "in line with the further consolidation necessary in the industry . . . ."

151.    Despite these announcements, the press release assured investors that Nortel's cash balance was more than adequate, as "the Company expect[ed] its cash balances at the end of the third and fourth quarters to be between approximately $2.6 billion and $2.9 billion."   The press release further assured investors that Nortel's actions would "strengthen the Company's balance sheet, [and] provide funds for the restructuring, as well as fund . . . potential investments in the Enterprise business."

152.    In response to the downward revisions to Nortel's full-year 2008 guidance and the announcements that Nortel planned to engage in further restructuring and sell its Metro Ethernet Networks business, the price of Nortel common stock plummeted more than 49%, from a closing

price of $5.30 per share on September 16, 2008, to close at $2.68 per share on September 17, 2008, on unusually heavy trading volume of more than 38 million shares traded.

153.   Analysts expressed surprise and confusion over the Company's announcements, with a September 17, 2008 Morgan Stanley analyst report describing "[t]he market timing of a prospective sale" of Nortel's MEN business "and [the] reversal by management regarding this business" as "puzzling."  TD Newcrest stated in a September 18, 2008 analyst report that it was "shocked by the decision to sell MEN" as the "business [was] viewed, by many, as a crown jewel of the company."

154.   In addition, a September 17, 2008 JPMorgan analyst report expressed concern that Nortel's announcement "that it could be looking to deemphasize its 4G/LTE business indicates [Nortel's] entire wireless business, which made up 34% of revenue last quarter, could in fact end up being a dead end, perennially declining asset."  In a follow up report issued the next day, JPMorgan opined that "the decision to sell MEN is largely motivated by a deteriorating balance sheet as new guidance calls for a $400-500M decline in cash from Q2."  The report stated that "[g]iven the risk of ongoing cash burn, we believe Nortel could be moving precariously close to needing an external cash infusion to prop up the $2.6B currently on the balance sheet vs. $4.5B in debt."

155.   A Deutsche Bank analyst report dated September 17, 2008 described Defendants' statements attributing the downward revision in guidance to "a slowdown in carrier and enterprise spending" as "***misleading***," and opined that "macro conditions are only one factor." The report stated that Nortel "has also fallen behind its competitors on several key technologies and has lost significant carrier trials.  We also think the company faces declines other than the carrier slowdown they mentioned."

156.     *The Globe and Mail* summarized Nortel's announcements in a September 18, 2008 article entitled "Nortel shocks market with bid to sell key unit," which reported that "[o]nly last month, chief executive officer Mike Zafirovsky [*sic*] spoke of 'double-digit' growth for the company and the conclusion of three tough years of cutbacks and restructuring.  Yesterday, he outlined a grim scenario in which sales in the current quarter will fall about 13 percent from a year earlier and the company will shrink by as much as 4 per cent for the full year."

157.     On November 10, 2008, Nortel belatedly announced that it had recorded a goodwill impairment charge of *$1.142 billion*, representing the entire amount of the reported goodwill associated with the Enterprise and MEN segments.  In response, the price of Nortel common stock tumbled 18.8%, from a closing price of $1.17 per share on November 7, 2008 (the previous trading day), to close at $0.95 per share on November 10, 2008, on more than double the previous day's trading volume.

158.     Subsequently, on December 10, 2008, investors began to discover that, in contrast to Defendants' representations that Nortel's turnaround efforts were succeeding, those efforts were a complete failure, and Nortel was performing so far below expectations that the Company would likely file for bankruptcy protection.  On that date, *The Wall Street Journal* reported that Nortel had "sought legal counsel to explore bankruptcy-court protection from creditors in the event that its restructuring plan fails, according to people familiar with the situation."  This news caused the price of Nortel common stock to decline an additional 23%, from a closing price of $0.52 per share on December 9, 2008, to close at $0.40 per share on December 10, 2008, on heavy trading volume.

159.     Finally, on January 14, 2009, Nortel announced that  the Company and certain of its operating subsidiaries had initiated creditor protection proceedings in Canada under the

Companies' Creditors Arrangement Act, in the United States under Chapter 11 of the United States Bankruptcy Code, and in the United Kingdom under the Insolvency Act 1986.   In response to this news, the price of Nortel's common stock plummeted more than 65% on heavy trading volume, from a closing price of $0.32 per share on January 13, 2009, to close at just $0.11 per share on January 14, 2009.

160.    The market for Nortel securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Nortel securities traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired Nortel securities relying upon the integrity of the market price of Nortel securities and market information relating to Nortel, and have been damaged thereby.

161.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Nortel securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

162.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Nortel's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive

assessment of Nortel and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

### Post-Class Period Events

163.    On January 14, 2009, following the announcement that Nortel was filing for bankruptcy protection, the NYSE suspended trading in the Company's common stock.   On February 2, 2009, Nortel's common stock was delisted from the NYSE.

164.    On June 20, 2009, Nortel announced that rather than restructuring, it would cease operations and sell off all of its businesses and assets.   Defendant Zafirovski resigned from the Company on August 10, 2009.

165.    Nortel's last major assets, approximately 6,000 patents and patent applications, were sold to a consortium including Apple, EMC, Ericsson, Microsoft, Research In Motion and Sony in July 2011.   In total, the sale of Nortel's businesses and assets generated more than $7.5 billion in proceeds.

166.    Thereafter, the Company was split into regional entities which would continue the wind-down process.   On October 3, 2012, Nortel's Board of Directors disbanded and all remaining executive officers resigned from the Company.

### Additional Scienter Allegations

167.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued or disseminated in the name of the Company or in their own name during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the

investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Nortel, their control over, and/or receipt and/or modification of Nortel's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Nortel, were active and culpable participants in the fraudulent scheme alleged herein.

168.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including each of the Defendants.

169.    The fraud alleged herein relates to the core business of Nortel, so knowledge of the fraud may be imputed to Defendants.  Moreover, as a member of Nortel's Board of Directors (the "Board"), Defendant Zafirovski regularly attended Board meetings, during which periodic, detailed reports were provided to Board members concerning Nortel's financial and operating condition.  Zafirovski was also provided with information packages in advance of Nortel Board meetings, as well as presentation materials delivered at the meetings.  Defendant Binning provided quarterly updates to the Board, which, among other things, compared the Company's performance to Defendants' guidance and discussed the status of the Company's turnaround initiatives.

170.    Throughout the Class Period, Defendants were aware of, or recklessly disregarded, information contradicting their public statements.  For example, according to the

minutes of a May 7, 2008 Board meeting, Defendant Zafirovski discussed "the decline" in Nortel's CDMA business and "noted the revenue risk in [the] Carrier and Enterprise" businesses in the context of discussing "the second quarter and full year 2008 financial outlook versus budget."  During the same Board meeting, Defendant Binning discussed Nortel's "weak balance sheet" and "challenges for the second quarter of 2008, including order momentum." Nonetheless, the very same day, at Nortel's annual shareholder meeting, Defendants highlighted the Company's "growing momentum with customers," stated that Nortel had made "solid financial progress that the company [can] build upon in 2008" and, two weeks later, on May 21, 2008, confirmed the Company's full-year guidance.

171.    Information provided by confidential witnesses, set forth above, further contributes to a strong inference that Defendants acted with scienter.  For example:

- CW4 believed that customer complaints stemming from Nortel's ongoing workforce reduction, as well as threats by key customers to cut their orders, were conveyed to Nortel's executive management, including Defendants.

- In addition, CW4 believed that Defendant Zafirovski received consolidated sales reports showing Nortel's deteriorating sales figures.

- CW6 was aware of an email sent by the head of a major customer directly to Defendant Zafirovski stating words to the effect that: "We'll rip your network apart and send the pieces back to you because of your incompetency."

- According to CW3, Nortel's executive management held detailed reviews of the impact that customers' forecasted capital expenditures would have on Nortel, which reviews were based on presentations made by the Company's finance and sales teams.  As such, Nortel's executive management would have been aware of AT&T's expected reduction in 2008 capital expenditures, announced at the very end of 2007 or the beginning of 2008.

- Furthermore, CW3 stated that Defendant Zafirovski attended regular meetings with AT&T's CEO.

172.    As set forth above, Defendants improperly delayed recognizing a $2.379 billion impairment charge to the value of Nortel's goodwill, which Defendants knew or recklessly

- 62 -

disregarded was impaired by no later than May 2, 2008, the start of the Class Period.  Defendants
were motivated to delay recording the goodwill impairment charge so that Nortel could conduct
the 2016 Notes Offering on favorable terms, thereby raising $655 million in net proceeds, which
enabled the Company to redeem the entire outstanding principal of 4.25% convertible senior
notes maturing on September 1, 2008.

### Loss Causation/Economic Loss

173.    During the Class Period, as detailed herein, Defendants engaged in a scheme to
deceive the market and a course of conduct that artificially inflated the price of Nortel securities
and operated as a fraud or deceit on Class Period purchasers of Nortel securities by failing to
disclose and misrepresenting the adverse facts detailed herein.   When Defendants' prior
misrepresentations and fraudulent conduct were disclosed and became apparent to the market,
the price of Nortel securities fell precipitously as the prior artificial inflation dissipated.  As a
result of their purchases of Nortel securities during the Class Period, Plaintiffs and the other
Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

174.    By failing to disclose to investors the adverse facts detailed herein, Defendants
presented a misleading picture of Nortel's business and prospects.   Defendants' false and
misleading statements and omissions had the intended effect and caused Nortel common stock to
trade at artificially inflated levels throughout the Class Period, reaching as high as $10.21 per
share on June 17, 2008, before collapsing to just $0.11 per share on January 14, 2009.

175.    During Nortel's August 1, 2008 conference call, Defendant Zafirovski – under
questioning from analysts – admitted that one of Nortel's Carrier Networks customers had "shut
the door on short-term capital expenditures," but failed to disclose the widespread, long-term
nature of the decline in orders that Nortel had been experiencing, stated that Nortel's guidance
took the customer's spending freeze into account, and insisted that Nortel was not losing market

share.  In response to the disclosure of a "short-term" spending freeze by one of Nortel's Carrier Networks customers, the price of Nortel common stock declined $1.12 per share, or more than 14%, from a closing price of $7.64 per share on July 31, 2008, to close at $6.52 per share on August 1, 2008, on heavy trading volume.  However, Defendants' misleading reassurances and continued positive statements about the Company's business prevented a more substantial decline in Nortel's stock price.

176.    Six weeks later, on September 17, 2008, Defendants announced that Nortel had revised its full-year 2008 guidance, citing "significant pressure as Carrier customers cut back their capital expenditures further than previously expected and certain Enterprise and [MEN] customers defer new IT and optical investments."  Defendants told investors that they now expected revenues to decline 2% to 4% compared to 2007, gross margins to be approximately 42 percent of revenue, and management operating margins to improve by only 125 to 175 basis points compared to 2007.  Defendants also disclosed that Nortel was engaging in a "comprehensive review" of its business and that "planning" was "underway for further restructuring and other cost reduction initiatives . . . ."  Finally, Defendants announced that Nortel planned to sell its MEN business, which included the 40/100G optical networking technology that the Company had recently launched at the start of the Class Period and had repeatedly highlighted as an important source of revenue growth.  In response to the Company's announcements, the price of Nortel stock plummeted more than 49%, from $5.30 per share to $2.68 per share, on heavy trading volume.

177.    On November 10, 2008, Nortel belatedly announced that it had recorded a goodwill impairment charge of *$1.142 billion*, representing the entire amount of the reported goodwill associated with the Enterprise and MEN segments.  In response, the price of Nortel

common stock tumbled 18.8%, from a closing price of $1.17 per share on November 7, 2008 (the previous trading day), to close at $0.95 per share on November 10, 2008, on more than double the previous day's trading volume.

178.   On December 10, 2008, investors began to discover that, in contrast to Defendants' representations that Nortel's turnaround efforts were succeeding, those efforts were a complete failure, and Nortel was performing so far below expectations that the Company would likely file for bankruptcy protection.  On that date, *The Wall Street Journal* reported that Nortel had "sought legal counsel to explore bankruptcy-court protection from creditors in the event that its restructuring plan fails, according to people familiar with the situation."  This news caused the price of Nortel common stock to decline an additional 23%, from a closing price of $0.52 per share on December 9, 2008, to close at $0.40 per share on December 10, 2008, on heavy trading volume.

179.   Finally, on January 14, 2009, Nortel announced that it and certain of its operating subsidiaries would seek bankruptcy protection under the Companies' Creditors Arrangement Act in Canada and that certain of the Company's U.S. subsidiaries had filed voluntary petitions in the United States under Chapter 11 of the U.S. Bankruptcy Code.  In response to this news, the price of Nortel's common stock plummeted more than 65% on heavy trading volume, from a closing price of $0.32 per share on January 13, 2009, to close at just $0.11 per share on January 14, 2009.

180.   The precipitous decline in the price of Nortel securities was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the decline in the price of Nortel securities negates any inference that the losses suffered by Plaintiffs and the other Class members was caused by changed market

conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Nortel securities and the subsequent significant decline in the value of Nortel securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**Applicability of Presumption of Reliance:**
**Fraud-on-the-Market Doctrine**

181.   At all relevant times, the market for Nortel securities was an efficient market for the following reasons, among others:

(a)   Nortel common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b)   as a regulated issuer, Nortel filed periodic public reports with the SEC and the NYSE;

(c)   Nortel regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Nortel was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

182.   As a result of the foregoing, the market for Nortel securities promptly digested current information regarding Nortel from all publicly available sources and reflected such

information in Nortel's stock price. Under these circumstances, all purchasers of Nortel securities during the Class Period suffered similar injury through their purchase of Nortel securities at artificially inflated prices and a presumption of reliance applies.

183.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Nortel's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## No Safe Harbor

184.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged herein.  Many of the statements alleged were not identified as "forward-looking" when made, and, to the extent any statements were forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements alleged, Defendants are liable for such statements because, at the time they were made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Nortel who knew that those statements were false when made.

**COUNT I**

**Violation of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder
Against All Defendants**

185.    Plaintiffs repeat and reallege each allegation above as if fully set forth herein.

186.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

187.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

188.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Nortel securities.  Plaintiffs and the Class would not have purchased Nortel securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

189.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Nortel securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against All Defendants

190.     Plaintiffs repeat and reallege each allegation above as if fully set forth herein.

191.     Defendants acted as controlling persons of Nortel within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions as officers and/or directors of Nortel, and their ownership of Nortel stock, Defendants had the power and authority to, and did, cause Nortel to engage in the wrongful conduct alleged.

192.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Nortel securities during the Class Period.

193.     By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action, certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Lead Counsel as Class Counsel;

B.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.


DATED:  September 15, 2017                    ROBBINS GELLER RUDMAN
                                                              & DOWD LLP
                                                      SAMUEL H. RUDMAN
                                                      DAVID A. ROSENFELD
                                                      ERIN W. BOARDMAN
                                                      ALAN I. ELLMAN


                                                      */s/ David A. Rosenfeld*
                                                      DAVID A. ROSENFELD

                                                      58 South Service Road, Suite 200
                                                      Melville, NY  11747
                                                      Telephone:  631/367-7100
                                                      631/367-1173 (fax)
                                                      srudman@rgrdlaw.com
                                                      drosenfeld@rgrdlaw.com
                                                      eboardman@rgrdlaw.com
                                                      aellman@rgrdlaw.com

                                                      *Lead Counsel for Plaintiffs*

                                                      HOLZER & HOLZER, LLC
                                                      COREY D. HOLZER
                                                      MARSHALL P. DEES
                                                      1200 Ashwood Parkway, Suite 410
                                                      Atlanta, GA  30338
                                                      Telephone:  770/392-0090
                                                      770/392-0029 (fax)

                                                      KAUFMAN, COREN & RESS, P.C.
                                                      DEBORAH R. GROSS
                                                      Two Commerce Square, Suite 3900
                                                      2001 Market Street
                                                      Philadelphia, PA 19103
                                                      Telephone:  215/735-8700
                                                      215/735-5170 (fax)
                                                      dgross@kcr-law.com

                                                      *Additional Counsel for Plaintiffs*

- 70 -

<u>CERTIFICATE OF SERVICE</u>

I, David A. Rosenfeld, hereby certify that on September 21, 2017, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.


_____
*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

KIEN CHEN ("Plaintiff") declares:

1.  Plaintiff has reviewed a complaint and authorized its filing.

2.  Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.  Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6.  The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 14 day of September, 2017.

_Kien Chen_
KIEN CHEN

NORTEL

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 05/05/2008 | 3,670 | $8.18 |
| 05/13/2008 | 2,000 | $7.90 |
| 06/03/2008 | 1,612 | $8.05 |
| 06/06/2008 | 3,000 | $7.75 |
| 06/18/2008 | 2,000 | $9.75 |
| 10/20/2008 | 2,000 | $1.67 |
| 10/24/2008 | 1,000 | $1.09 |

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

MORENO MINTO ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6.      The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _14th_ day of September, 2017.

MORENO MINTO

# SCHEDULE A

## SECURITIES TRANSACTIONS

Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 05/23/2008 | 100 | $8.13 |
| 05/23/2008 | 100 | $8.13 |
| 05/23/2008 | 400 | $8.13 |
| 05/23/2008 | 49,400 | $8.13 |
| 05/29/2008 | 200 | $8.51 |
| 05/29/2008 | 200 | $8.51 |
| 05/29/2008 | 400 | $8.51 |
| 05/29/2008 | 500 | $8.51 |
| 05/29/2008 | 2,300 | $8.51 |
| 05/29/2008 | 6,900 | $8.51 |
| 05/29/2008 | 15,000 | $8.50 |
| 05/29/2008 | 24,500 | $8.51 |
| 07/17/2008 | 50.000 | $6.80 |
| 10/10/2008 | 2,400 | $1.49 |
| 10/10/2008 | 2,500 | $1.51 |
| 10/17/2008 | 200 | $1.69 |
| 10/17/2008 | 200 | $1.70 |
| 10/17/2008 | 24,800 | $1.70 |
| 10/17/2008 | 34,800 | $1.69 |
| 10/20/2008 | 30,000 | $1.65 |
| 10/20/2008 | 30,000 | $1.68 |
| 10/22/2008 | 20.650 | $1.48 |
| 10/22/2008 | 39,350 | $1.47 |
| 10/22/2008 | 60,000 | $1.17 |
| 10/23/2008 | 60,000 | $0.96 |
| 10/23/2008 | 60,000 | $1.19 |
| 10/30/2008 | 38,000 | $1.16 |
| 11/04/2008 | 22,000 | $1.28 |
| 11/07/2008 | 60,000 | $0.77 |
| 11/21/2008 | 100 | $0.42 |
| 11/21/2008 | 6,600 | $0.41 |
| 11/21/2008 | 45,300 | $0.41 |
| 11/21/2008 | 46,900 | $0.42 |
| 12/03/2008 | 1,000 | $0.57 |
| 12/03/2008 | 10,100 | $0.57 |
| 12/05/2008 | 11,100 | $0.37 |
| 12/05/2008 | 98,900 | $0.29 |
| 12/08/2008 | 50,000 | $0.57 |
| 12/09/2008 | 25,000 | $0.55 |
| 12/10/2008 | 50,000 | $0.34 |

Sales

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 10/10/2008 | 2,400 | $1.54 |
| 10/10/2008 | 2,500 | $1.45 |
| 10/17/2008 | 100 | $1.66 |
| 10/17/2008 | 100 | $1.67 |
| 10/17/2008 | 100 | $1.68 |
| 10/17/2008 | 100 | $1.69 |
| 10/17/2008 | 1,700 | $1.58 |
| 10/17/2008 | 4,011 | $1.57 |
| 10/17/2008 | 15,848 | $1.56 |
| 10/17/2008 | 24,800 | $1.68 |
| 10/17/2008 | 34,800 | $1.66 |
| 10/17/2008 | 38,441 | $1.55 |
| 10/20/2008 | 60,000 | $1.17 |
| 10/22/2008 | 60,000 | $0.96 |
| 10/22/2008 | 60,000 | $1.45 |
| 10/23/2008 | 100 | $1.21 |
| 10/23/2008 | 600 | $1.22 |
| 10/23/2008 | 59,300 | $1.21 |
| 10/23/2008 | 60,000 | $0.77 |
| 11/07/2008 | 8,160 | $1.18 |
| 11/07/2008 | 11,500 | $1.19 |
| 11/07/2008 | 40,340 | $1.17 |
| 11/21/2008 | 200 | $0.40 |
| 11/21/2008 | 1,500 | $0.40 |
| 11/21/2008 | 23,300 | $0.40 |
| 11/21/2008 | 98,900 | $0.29 |
| 12/03/2008 | 11,100 | $0.37 |
| 12/05/2008 | 300 | $0.45 |
| 12/05/2008 | 500 | $0.46 |
| 12/05/2008 | 900 | $0.46 |
| 12/05/2008 | 9,700 | $0.46 |
| 12/05/2008 | 98,600 | $0.45 |
| 12/08/2008 | 50,000 | $0.34 |
| 12/10/2008 | 50,000 | $0.42 |