UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
                                       :
DAVID LUCESCU, Individually and On     :
Behalf of All Others Similarly         :          09cv4691 (DLC)
Situated,                              :
                    Plaintiff,         :          OPINION AND ORDER
                                       :
         -v-                           :
                                       :
MIKE ZAFIROVSKI and PAVI BINNING,      :
                                       :
                    Defendants.        :
                                       :
---------------------------------------X

APPEARANCES:

For the plaintiffs:
Samuel H. Rudman
David A. Rosenfeld
Erin W. Boardman
Alan I. Ellman
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY 11747

For the defendants:
Joel C. Haims
Jamie A. Levitt
James J. Beha II
Steven T. Rappoport
Christina L. Golden
Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019

DENISE COTE, District Judge:

        In early 2009, during the world financial crisis, Nortel

Networks Corporation ("Nortel") filed for bankruptcy protection.

Nortel emerged from bankruptcy and the bankruptcy stay was

lifted in 2017.  Accordingly, this securities fraud class action

lawsuit, which was filed in 2009 and asserts claims against two

Nortel executives for activities in 2008, is once again active.

For the following reasons, the defendants' motion to dismiss the

action is now granted.

BACKGROUND

The following facts are primarily drawn from the first

amended complaint ("FAC") and documents it incorporates by

reference.[1]  They are taken in the light most favorable to the

plaintiffs.  Nortel was a supplier of end-to-end networking

products.  Its principal place of business was in Toronto,

Canada.  Its stock traded on the Toronto Stock Exchange and the

New York Stock Exchange.

In 2004, an accounting fraud came to light at Nortel.  This

led to the restatement of billions of dollars in revenue.

Defendant Mike Zafirovski was brought in as Nortel's CEO in

November 2004 to revitalize the company.  In late 2005, under

---

[1] While the FAC selectively quotes from numerous documents,
including filings with the SEC, the plaintiffs did not attach
any of the documents to the FAC.  Those documents, however, are
"incorporated in it by reference." Nicosia v. Amazon.com, Inc.,
834 F.3d 220, 230 (2d Cir. 2016) (citation omitted).  Moreover,
"[w]here a document is not incorporated by reference, the court
may neverless consider it where the complaint relies heavily
upon its terms and effect, thereby rendering the document
integral to the complaint." DiFolco v. MSNBC Cable L.L.C., 622
F.3d 104, 111 (2d Cir. 2010) (citation omitted).  Defendants
attached many of the documents as exhibits to their brief in
support of their motion to dismiss.

Zafirovski's guidance, Nortel commenced a Business Transformation Plan that was designed to return Nortel to profitability. Pavi Binning served as Nortel's Chief Financial Officer ("CFO") from November 12, 2007 to March 2, 2009, and is named as the second defendant in this action. The class period runs from May 2, 2008 and January 13, 2009 (the "Class Period").[2]

The FAC, filed on September 21, 2017, asserts that the two individual defendants made materially false statements in 2008 about Nortel's relationship with key customers and failed to timely write down over $2.3 billion of goodwill, which they knew was impaired as of May 2, 2008.[3] According to the FAC, the defendants were motivated to delay writing down the goodwill so that Nortel could conduct a private placement. The FAC places emphasis on the following events.

---

[2] The original complaint asserted a Class Period running from May 2, 2008 to September 17, 2008. The FAC extends the Class Period to January 13, 2009.

[3] In broad terms, goodwill is a measurement of the value of a company's intangible assets over and above the fair market value of identifiable assets and liabilities. See Aswath Damodaran, Damodaran on Valuation 423 (2d ed. 2006) ("The most charitable interpretation of goodwill is that it measures the estimated value of growth assets in the target company; growth assets are investments that the target company is expected to make in the future.").

First Quarter Results

On May 2, 2008, the first day of the Class Period, Nortel announced its results for the first quarter of 2008. The first quarter Form 10-Q, dated May 2, 2008, was signed by Binning. The Form 10-Q represented that Nortel's financial results were presented in conformity with Generally Accepted Accounting Principles ("GAAP"). The Form 10-Q reported that Nortel had goodwill valued at $2.58 billion. The Form 10-Q also disclosed Nortel's process for testing goodwill for possible impairment.

Nortel's first quarter Form 10-Q stated in part:

We test goodwill for possible impairment on an annual basis as of October 1 of each year <u>and at any other time if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount</u>. Circumstances that could trigger an impairment test between annual tests include, but are not limited to: a significant adverse change in the business climate or legal factors; an adverse action or assessment by a regulator; unanticipated competition; loss of key personnel; the likelihood that a reporting unit or a significant portion of a reporting unit will be sold or disposed of; a change in reportable segments; results of testing for recoverability of a significant asset group within a reporting unit; and recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit.

(Emphasis added.)

Nortel held a conference call with investors and issued a press release on May 2. The press release confirmed Nortel's previously announced forward-looking guidance for the full fiscal year. The release noted that the company was making

solid progress in repairing and turning around the company.  It
noted that the company expected to "achieve [its] full year
guidance and . . . continue to make solid progress against the
strategy to turn around the company."  The release also
projected "low single digit" revenue growth for the year.

During the May 2 conference call, Zafirovski focused on
Nortel's customer relationships, stating that Nortel was
continuing to "build market and customer momentum," but
cautioned that the company was operating in a "tough macro
environment" and a "very uncertain environment."  Nonetheless,
he and the company continued to have an optimistic outlook on
the remainder of the year.  The press release, and Zafirovski on
the call, signaled that the statements made were forward-looking
and assumed stable growth in customers' capital expenditures.
On the call, Zafirovski warned that the company's success was
"ultimately based on the customers embracing [the company's]
strategy."  In response to a question about wireless demand from
customers, Zafirovski answered that the demand was "pretty
flattish overall."

Less than a week later, on May 7, Nortel held its annual
shareholder meeting.  There, again, Zafirovski focused on
Nortel's "growing momentum" with its customers.  A
simultaneously published press release, authored by Zafirovski,
emphasized that Nortel was still engaging in a massive turn-

around effort: although optimistic, the press release conceded that Nortel was still in a "remaking" process and undergoing a "business transformation plan."  In addressing the company's effort to "rebuild," the release noted that Nortel was experiencing "improved employee and customer satisfaction."

May Note Offering

Later, on May 21, 2008, Nortel issued another press release, confirming its 2008 outlook.  Nortel also announced on May 21 that its principal direct operating subsidiary, Nortel Networks Limited, would commence a $500 million note offering. The offering closed on May 28.  It raised $675 million.  The proposed class does not include any debt holders from that offering.

Second Quarter Results

On August 1, 2008, Nortel announced its results for the second quarter of 2008.  It filed its second quarter Form 10-Q on August 1, again signed by Binning.  The Form 10-Q represented that Nortel's financial results were presented in conformity with GAAP.  The Form 10-Q reported that Nortel had goodwill valued at $2.57 billion.  The Form 10-Q reiterated Nortel's process for testing goodwill for possible impairment.

Also on August 1, Nortel held a conference call with investors and issued a press release.  Nortel announced that its second quarter results were consistent with its overall outlook

for the fiscal year, but Zafirovski admitted on the conference call that one of its Carrier Network customers had "shut the door on short-term capital expenditures."  Zafirovski also cautioned that "there is not much visibility [with] what is going to happen in the next 3, 6, 9 months."  Defendant Binning also participated on the August 1 conference call, stating that he anticipated "future growth" from investments the company had made in "key programs."  Like with its announcement in May, Nortel cautioned that it was operating in a challenging business environment.  It specifically noted potential losses from "key" North American customers.

Nortel also filed a Form 8-K and accompanying press release on August 1, 2008.  The press release stated: "Nortel's financial performance in the first half of 2008 has been consistent and disciplined.  We have achieved our objectives and are on track to meet our targets for the year."  But with respect to earnings for the second quarter, the release noted:

> The Company reported a net loss in the second quarter of 2008 of $113 million, or $0.23 per common share on a basic and diluted basis, compared to a net loss of $37 million, or $0.07 per common share on a basic and diluted basis, in the second quarter of 2007 and a net loss of $138 million, or $0.28 per common share on a diluted basis, in the first quarter of 2008.

While confirming its full year outlook, the press release warned "Nortel faces a challenging business environment with increasing risk. . . ."  The price of Nortel's common stock declined from a

closing price of $7.64 per share on July 31 to close at $6.52
per share on August 1.

Third Quarter Results

On September 15, Lehman Brothers filed for bankruptcy. On
September 17, 2008, Nortel pre-announced its third quarter
results. In that announcement, Nortel lowered its full-year
2008 outlook, which it had confirmed as recently as August 1.
Specifically, it announced that its revenue would decline, its
gross margin was lower than previously announced, and its
operating margin would increase less than half the number of
basis points than previously projected. Nortel explained that
there were both localized and broad reasons for this change in
outlook: Nortel's customers were cutting back their capital
expenditures and the company was operating in a difficult
economic market. Nortel's stock tumbled after this
announcement. At that same time, the global stock market fell
dramatically.

November 2008 Impairment Announcement

On November 10, 2008, Nortel filed a Form 8-K and
accompanying press release in conjunction with its third quarter
results. Nortel announced that it had written down the value of
its goodwill after the drop in its share price following its

September announcement.[4]  It recorded a goodwill impairment

charge of $1.142 billion, representing the entire amount of the

reported goodwill associated with two of its business segments:

Enterprise and MEN.

The press release explained:

Goodwill is tested for possible impairment on an annual
basis and any time an event occurs or circumstances change
that would more likely than not reduce the fair value of a
reporting unit below its carrying amount.  Such an event
occurred with the Company's market capitalization being
less than book value for a sustained period combined with
the continuation of challenging market conditions.

The November 10, 2008 Form 8-K press release announced that this

charge against Nortel's goodwill took place sometime during the

"third quarter of 2008."  Nortel's common stock price, which had

closed at $1.17 per share on November 7, 2008, closed at $0.95

per share on November 10, 2008.

In its 2008 Form 10-K, signed by both defendants and filed

on March 2, 2009, after Nortel had filed for bankruptcy, see

infra, Nortel revealed more information about its goodwill

impairment charge during the third quarter of 2008.[5]  The Form

---

[4] The Financial Accounting Standards Board's Statement of
Financial Accounting Standards No. 142, titled Goodwill and
Other Intangible Assets ("SFAS 142"), issued in June 2001,
provides that the value of goodwill should be tested for
impairment at least annually, and "more frequently if events and
circumstances indicate that the assets might be impaired."  FASB
No. 142, June 2001, 12.

[5] The plaintiffs do not quote the 2008 Form 10-K in the FAC, nor
is it attached as an exhibit to the FAC or the plaintiffs'

10-K explained that Nortel conducted an interim period goodwill impairment test on September 30, 2008.  Nortel performed the interim impairment test because events and circumstances "had changed that required it to perform" such a test.  The Form 10-K referred to "significant pressure resulting from the expanding economic downturn", foreign exchange fluctuations, "challenging market conditions, particularly in the U.S.," and a loss in market value, among other things.  The Form 10-K explained that Nortel "perform[ed] an additional interim period goodwill impairment test" on December 31, 2008 because the company "observed further deterioration in industry conditions, [and in] global economic and credit conditions."  The total goodwill impairment charge after the second test was nearly $2.4 billion.

Bankruptcy

On December 10, 2008, the Wall Street Journal reported that Nortel was exploring bankruptcy.  The price of Nortel's common stock closed at $0.40 per share on December 10, compared to a closing price of $0.52 per share on December 9.  On January 14, 2009, Nortel announced that it would seek bankruptcy protection in Canada, the United Kingdom, and the United States.  With that announcement, the price of Nortel's common stock fell by more

---

opposition to this motion.  The plaintiffs quote from it at length, however, in their opposition brief.

than 65%, to a closing price of $0.11 per share on January 14, 2009.

## PROCEDURAL HISTORY

On January 14, 2009, the Ontario Superior Court issued an Initial Order in Nortel's Canadian Companies' Creditors Arrangement Act ("CCAA") proceeding. That Initial Order stayed all proceedings against Nortel and its current and former officers and directors. On February 27, 2009, a United States Bankruptcy Court recognized Nortel's CCAA proceeding as a "foreign main proceeding" and stayed all proceedings against Nortel and its officers and directors. In re Nortel Networks Corp., 2013 WL 6053845, at *1 (D. Del. Nov. 15, 2013).

David Lucescu filed the complaint in this action in this district on May 18, 2009. The Honorable Shira Scheindlin placed the case on the suspense docket on November 9, 2010. In January 2017, the Ontario Superior Court approved Nortel's plan of reorganization and lifted the CCAA stay on May 15. On June 23, 2017, the United States Bankruptcy Court for the District of Delaware recognized the Ontario Superior Court's May 15 order.

This lawsuit was reassigned to this Court on July 11, 2017, and was reopened on July 17. At an initial conference with the parties on August 4, 2017, the Court granted the plaintiff leave to file an amended complaint and set a briefing schedule for a

motion to dismiss.  On August 14, the Court allowed the case to continue with two lead plaintiffs, Moreno Minto and Kien Chen.[6]

Plaintiffs filed the FAC on September 21, 2017.  The FAC extends the Class Period to January 14, 2009 and adds allegations concerning the first and second quarter 2008 Form 10-Q filings and the second quarter 2008 earnings release.  The FAC also adds allegations from thirteen confidential witnesses ("CWs"), none of whom is alleged to have had any direct contact with either defendant and only one of whom is alleged to have worked in Nortel's headquarters.

Defendants moved to dismiss the FAC on October 6, 2017. The motion became fully submitted on November 10.  Because the additional allegations in the FAC do not overcome the deficiencies in the pleading, it is unnecessary to address whether these allegations are barred by the Exchange Act's statute of repose.


DISCUSSION

When deciding a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., a court must accept as true all allegations in the complaint and draw all reasonable inferences in the plaintiff's

---

[6] On August 14, 2017, the Court appointed Robbins Geller Rudman & Dowd LLP as lead counsel.  David Lucescu, who was named as a plaintiff in the original complaint in this action, is not named in the FAC.

favor.  Loginovskaya v. Batratchenko, 764 F.3d 266, 269-70 (2d Cir. 2014).  A claim has facial plausibility when "the factual content" of the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016) (citation omitted).  In the context of a securities class action, a court may consider not only the complaint itself, but also "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  Id. (citation omitted).

Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA") and Fed. R. Civ. P. 9(b) by "stating with particularity the circumstances constituting fraud."  Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 304 (2d Cir. 2015) (citation omitted).  The PSLRA "builds on Rule 9's particularity requirement, dictating the pleading standard for claims brought under the Exchange Act."  Id.  To satisfy the pleading standard for a misleading statement or omission under Rule 9(b), a complaint must "(1) specify the statements that the plaintiff contends

were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Id. at 305 (citation omitted). The PSLRA's requirements are similar, stating that the complaint must

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1). Thus, plaintiffs asserting claims under the PSLRA "must do more than say that the statements were false and misleading; they must demonstrate with specificity why and how that is so." Carpenters Pension Trust Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 236 (2d Cir. 2014) (citation omitted).

I. Section 10(b) Legal Standard

The FAC alleges that defendants violated § 10(b) of the Exchange Act. Section 10(b) and its implementing SEC Rule 10b-5 make it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b); see also 15 U.S.C. § 78j(b).

To state a claim under Rule 10b-5 for misrepresentations, a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury.

Blanford, 794 F.3d at 305 (citation omitted).

a. Misstatements or Omissions of Material Fact

"Rule 10b-5 expressly requires an actual statement, one that is either untrue outright or misleading by virtue of what it omits to state." In re Vivendi, S.A. Securities Litigation, 838 F.3d 223, 239 (2d Cir. 2016) (citation omitted). "[A]n omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 101 (2d Cir. 2015) (citation omitted). "Such a duty may arise when there is a corporate insider trading on confidential information, a statute or regulation requiring disclosure, or a corporate statement that would otherwise be inaccurate, incomplete, or misleading." Id. (citation omitted).

"[E]xpressions of puffery and corporate optimism do not give rise to securities violations" because "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage."

Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) (citation

omitted). "To succeed" on a securities fraud claim, "plaintiffs

must do more than say that the statements in . . . press

releases were false and misleading; they must demonstrate with

specificity why and how that is so." Id. On the other hand, a

defendant's "[c]autionary words about future risk cannot

insulate from liability the failure to disclose that the risk

has transpired." Id. at 173.

When statements of opinion are the basis for alleging a

violation of securities laws,

> [t]he investor must identify particular (and
> material) facts going to the basis for the issuer's
> opinion -- facts about the inquiry the issuer did or
> did not conduct or the knowledge it did or did not
> have -- whose omission makes the opinion statement
> at issue misleading to a reasonable person reading
> the statement fairly and in context.

Tongue, 816 F.3d at 209 (quoting Omnicare, Inc. v. Laborers

Dist. Council Constr. Indus. Pension Fund, 135 S. Ct. 1318, 1332

(2015)). Liability for making a false statement of opinion may

lie if either "the speaker did not hold the belief she professed

or the supporting facts she supplied were untrue." Tongue, 816

F.3d at 210 (citation omitted). But "opinions, though sincerely

held and otherwise true as a matter of fact, may nonetheless be

actionable if the speaker omits information whose omission makes

the statement misleading to a reasonable investor." Id.

Upon hearing a statement of opinion from an issuer, a reasonable investor "expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at a time." Id. (citation omitted). But, reasonable investors "understand that opinions sometimes rest on a weighing of competing facts," and do "not expect that every fact known to an issuer supports its opinion statement." Id. (citation omitted). A statement of opinion "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." Id. (citation omitted). Accordingly, meeting the Omnicare standard "is no small task for an investor." Id. (citation omitted).

With respect to financial statements, such statements must be reported in accordance with Generally Accepted Accounting Principles, or GAAP. The Financial Accounting Standards Board ("FASB"), an independent private sector organization, is the "designated organization in the private sector for establishing standards of financial accounting and reporting" and promulgates GAAP. See S.E.C. v. Escala Group, Inc., 09cv2646 (DLC), 2009 WL 2365548, at *7 (S.D.N.Y. July 31, 2009). While there are "19 different GAAP sources," standards issued by FASB sit at the top of the hierarchy of GAAP sources. Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 101 (1995). FASB's standards have been recognized by the SEC as authoritative. See Statement of Policy

on the Establishment and Improvement of Accounting Principles
and Standards, SEC Release No. AS-150, 1973 WL 149263, at *1
(Dec. 20, 1973).

The goal of financial reporting is to "provide information
that is useful to present and potential investors and creditors
and other users in making rational investment, credit, and
similar decisions."  FASB Statement of Financial Accounting
Concepts No. 1, 11 (1978); see also Statement of Financial
Accounting Standards No. 168, Appendix A (June 2009).
"[F]inancial statements filed with the [SEC] which are not
prepared in accordance with generally accepted accounting
principles will be presumed to be misleading or inaccurate."  In
re Fannie Mae 2008 Sec. Litig., 742 F. Supp. 2d 382, 408
(S.D.N.Y. 2010) (quoting 17 C.F.R. § 210.4-01(a)(1)).

As noted above, FASB's Statement of Financial Accounting
Standards No. 142, titled Goodwill and Other Intangible Assets
("SFAS 142"), provides that the value of goodwill should be
tested for impairment at least annually, and "more frequently if
events and circumstances indicate that the assets might be
impaired."  The Second Circuit has held that "[e]stimates of
goodwill . . . are not matters of objective fact."  Fait v.
Regions Fin. Corp, 655 F.3d 105, 110 (2d Cir. 2011).  "Estimates
of goodwill depend on management's determination of the fair
value of the assets acquired and liabilities assumed, which are

not matters of objective fact." Id. A plaintiff arguing that a defendant failed to properly record an impairment charge must "point to objective standard[s] such as market price" that the plaintiff claims defendant "should have but failed to use in determining the value" of the company' assets. Id. "Absent such a standard, an estimate of the fair value of those assets will vary depending on the particular methodology and assumptions used." Id. at 111. Under §§ 10(b) and 20(a) of the Exchange Act, a plaintiff "must plausibly allege that defendants did not believe the statements regarding goodwill at the time they made them to plead a material misstatement or omission." City of Omaha, Neb. Civilian Employee's Retirement System v. CBS Corp., 679 F.3d 64, 67 (2d Cir. 2012) (emphasis added).

Interim goodwill impairment testing is required only where "events or changes in circumstances indicate that it is more likely than not that the book value of a reporting unit exceeds its fair value." Id. at 68 (citation omitted). "Moreover, even if [a plaintiff's] complaint . . . plausibly plead[s] that defendants were aware of facts that should have led them to begin interim impairment testing earlier, such pleading alone would not suffice to state a securities fraud claim." Id.

b. Scienter

To meet the scienter requirement in a Rule 10b-5 action under the PSLRA, a plaintiff must "state with particularity

facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). This "state of mind" requires a showing "of intent to deceive, manipulate, or defraud, or recklessness." Blanford, 794 F.3d at 305 (citation omitted). The PSLRA's "strong inference" requirement involves "taking into account plausible opposing inferences and considering plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Id. (citation omitted). It is "not enough to set out facts from which, if true, a reasonable person could infer that the defendant acted with the required intent." In re Advanced Battery Techs., Inc., 781 F.3d 638, 644 (2d Cir. 2015) (citation omitted). Rather, "[t]he inference of scienter must be cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. (citation omitted). In making this judgment, a court "must assess the complaint in its entirety, and not scrutinize each allegation." Blanford, 794 F.3d at 305.

"Allegations of a violation of GAAP provisions . . . without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." Stevelman v. Alias Research Co., 174 F.3d 79, 84 (2d Cir. 1999) (citation omitted). Further, a company's "subsequent revelation of its accounting policy change and retroactive announcement of lowered earnings"

are not "probative of conscious misbehavior or recklessness."
Id. "Mere allegations that statements in one report should
have been made in earlier reports do not make out a claim of
securities fraud." Id. (citation omitted).

"The requisite scienter can be established by alleging
facts to show either (1) that defendants had the motive and
opportunity to commit fraud, or (2) strong circumstantial
evidence of conscious misbehavior or recklessness." ECA, Local
134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,
553 F.3d 187, 198 (2d Cir. 2009) (citation omitted). "Action
taken to maintain the appearance of corporate profitability, or
of the success of an investment does not entail concrete
benefits sufficient to demonstrate motive." Rombach, 355 F.3d
at 177 (citation omitted).

Although circumstantial evidence of conscious misbehavior
or recklessness may support a strong inference of scienter, "the
strength of the circumstantial allegations must be
correspondingly greater if there is no motive." ECA, 533 F.3d
at 199 (citation omitted). To determine whether the complaint
raises a "strong inference" of scienter, courts must "take into
account plausible opposing inferences" to determine whether the
inference of scienter is "cogent and at least as compelling as
any opposing inference one could draw from the facts alleged."

<u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 323, 324 (2007).

In the securities fraud context, recklessness "must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care, not merely a heightened form of negligence." <u>In re Advanced Battery Techs., Inc.</u>, 781 F.3d at 644 (citation omitted). An "allegation that defendants behaved recklessly is weakened by their disclosure of certain financial problems prior to the deadline to file its financial statements." <u>Rombach</u>, 355 F.3d at 176. Further, "[m]ere allegations of GAAP violations or accounting irregularities or even a lack of due diligence will not state a securities fraud claim absent evidence of corresponding fraudulent intent." <u>In re Advanced Battery Techs., Inc.</u>, 781 F.3d at 644 (citation omitted).

> When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter. In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant.

<u>Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.</u>, 531 F.3d 190, 195 (2d Cir. 2008). The Second Circuit has not, however, held that the reverse is true: when a defendant is an individual it is insufficient to allege that the corporation, as a whole, acted with the requisite scienter and impute that

intent to an individual defendant.  A showing of corporate

scienter is inadequate to assign that scienter to individual

defendants.

II. Section 20(a) Legal Standard

Section 20(a) of the Exchange Act imposes derivative

liability on persons that control others who violate the

Exchange Act.  In re Vivendi, 838 F.3d at 238 n.6.  It provides:

(a) Joint and several liability; good faith defense

Every person who, <u>directly or indirectly, controls any</u>
<u>person liable under any provision of this chapter or</u>
<u>of any rule or regulation thereunder</u> shall also be
liable jointly and severally with and to the same
extent as such controlled person to any person to whom
such controlled person is liable (including to the
Commission in any action brought under paragraph (1)
or (3) of section 78u(d) of this title), <u>unless the</u>
<u>controlling person acted in good faith and did not</u>
<u>directly or indirectly induce the act or acts</u>
<u>constituting the violation or cause of action</u>.

15 U.S.C. § 78t(a) (emphasis supplied).

The statutory language identifies two components to a

control person claim: (1) a primary violation by a controlled

person and (2) direct or indirect control of the primary

violator by the defendant.  It also provides for an affirmative

defense of good faith.  The concept of "culpable participation,"

which is a regular fixture of the Second Circuit's

jurisprudence, describes that degree of control which is

sufficient to render a person liable under § 20(a).  In re

WorldCom, Inc. Sec. Litig., 02cv3288 (DLC) 294 F. Supp. 2d 392,

23

415 (S.D.N.Y. 2003); cf. Fed. Hous. Fin. Agency v. Nomura

Holding Am., Inc., 11cv6201 (DLC), 104 F. Supp. 3d 441, 575-78

(S.D.N.Y. 2015) (analyzing trial evidence of the nature of the

controlled entity, the status of the alleged controlling entity,

and the actions taken by the controlling entity on behalf of the

controlled entity) (Section 15 of the Securities Act).  "[T]here

is no required state of mind for a defendant's culpable

participation in a Section 20(a) offense."  In re WorldCom, Inc.

Sec. Litig., 294 F. Supp. 2d at 415; see In re WorldCom, Inc.

Sec. Litig., 02cv3288 (DLC), 2005 WL 638268, at *13 (S.D.N.Y.

Mar. 21, 2005).

Control over a primary violator may be established by

showing that the defendant possessed "the power to direct or

cause the direction of the management and policies of the

primary violators, whether through the ownership of voting

securities, by contract, or otherwise."  In re Lehman Bros.

Mortg.-Backed Sec. Litig., 650 F.3d 167, 185 (2d Cir. 2011)

(citation omitted).  Once the plaintiff makes out a prima facie

case of liability under § 20(a), the burden shifts to the

defendant "to show that he acted in good faith, and that he did

not directly or indirectly induce the act or acts constituting

the violation."  SEC v. First Jersey Sec., Inc., 101 F.3d 1450,

1473 (2d Cir. 1996) (citation omitted).

III. Application

a. The Alleged Misstatements

In opposition to this motion to dismiss, the plaintiffs rely on two sets of alleged misstatements. First, they assert that Zafirovski's statements surrounding Nortel's first and second quarter results are misleading and false to the extent that he did not discuss the reduction in capital investments by certain Nortel customers. Second, they assert that the statements in Nortel's first and second quarter financial reports -- the Forms 10-Q, signed by defendant Binning -- that the company's financial results were reported in compliance with GAAP were false. Neither set of alleged misstatements supports a claim.

i. Statements Regarding Customers

The defendants moved to dismiss the FAC's claims to the extent they were premised on the defendants' vague statements of optimism.[7] In opposition to this motion, the plaintiffs rely exclusively on statements made in a May 7, 2008 press release, which was issued on the heels of Nortel's annual shareholder

---

[7] The FAC refers to statements made the day the first quarter results were announced -- May 2, 2008 -- as well as at the annual shareholders meeting on May 7, 2008, and in an additional press release published on May 21, 2008 in conjunction with a debt offering. It also points to statements made in relation to Nortel's second quarter results: statements in the August 1, 2008 press release and conference call.

meeting.[8]  The plaintiffs contend that Zafirovski's statements in that press release regarding Nortel's relationships with its customers created a duty to disclose that Nortel was facing problems with its most important customers.

The statements on which the plaintiffs rely include such statements as:

> We see a big opportunity to step forward and become the 'voice of the customer' within communications and technology markets by driving innovation in ways that solves our customers' biggest challenges . . . .  We are turning customer focus into a competitive advantage by improving satisfaction . . . .  Nortel is not only addressing customer needs through innovation, but through operational initiatives as well. . . . Nortel's growing momentum with customers is evidence of progress against the company's business transformation plan . . . .  Our customer engagements are proving our relevance and momentum . . . .  I believe, more than ever, that we are on the right path today and are rebuilding our company in the right way.  We have improved employee and customer satisfaction.  We have made progress on our business transformation plan and customers are coming on board . . . .

The plaintiffs do not assert that any of these statements was false.  They do assert, however, that they created a duty to add information about existing problems that Nortel had with certain customers to avoid being misleading.  To support that assertion they rely on the following information provided by

---

several CWs.[9]  Nortel had experienced a significant decline in
revenue from its largest customer between 2006 and 2008, and
that decline was apparent by early 2008.  Two other large
customers had already announced that they were reducing their
forecasted capital expenditures for 2008 or were not ordering
any additional equipment from Nortel in 2008.  Moreover, two
Canadian customers had selected Nortel competitors to provide
them with high speed wireless equipment.[10]

For several reasons, the plaintiffs have not pleaded a
claim that Zafirovski was required to discuss specific customers
to correct or complete his statements regarding customer
momentum and other customer-related statements.  First,
Zafirovski's statements were general statements about the goals
and progress of the company in providing service to its
customers.  Each of these statements was forward-facing and a
broad description of the company's goals.  The statements were
not made in the context of discussions of specific customers or
even revenue.

---

[9] The opposition brief points to information provided by CWs 2,
3, 4, 12 and 13.

[10] The FAC does not indicate whether the selection of competitors
to provide high speed wireless equipment was already known to
the market.

Second, Nortel had already disclosed and emphasized that its own fortunes were dependent on the capital investments its customers would be making, and that that investment was uncertain given the overall financial climate. For instance in the May 2 press release, Nortel signaled that the statements made were forward-looking and took into account certain assumptions, like stable growth in customers' capital expenditures and that the company's success was "ultimately based on the customers embracing [the company's] strategy." On the May 2 conference call, in response to a question about wireless demand from customers, Zafirovski answered that the demand was "pretty flattish overall." He reminded shareholders and analysts that Nortel was operating in a "tough macro environment" and a "very uncertain environment."

Third, the public was aware that some Nortel customers had cut back business with Nortel or were generally reducing their capital expenditures. By May, at least two customers to which the CWs refer had already made public disclosures of those decisions; Nortel had no obligation to remind investors of information that was already publicly disclosed. Moreover, when Zafirovski admitted on August 1 that one significant North American customer had "shut the door" on short term capital expenditures, the plaintiffs do not allege that any shareholder or analyst followed up on that statement and asked for more

customer-specific information.  The plaintiffs also allege that revenue from one customer declined significantly because Nortel failed to win the customer's "LTE" business.  But the FAC acknowledges that this failure became clear at "the end of 2008," after the allegedly misleading statements at issue were made.  In sum, the plaintiffs have not pleaded a claim that defendants made misleading statements with respect to customer relationships.

ii. Goodwill Impairment

The defendants also move to dismiss the claims premised on Nortel's assertion of its compliance with GAAP, specifically in connection with the valuation of Nortel's goodwill in the first and second quarter Forms 10-Q signed by defendant Binning.  They contend that the plaintiffs' claim amounts to nothing more than a disagreement about Nortel's subjective accounting judgments.

The plaintiffs allege that the estimate of Nortel's goodwill of almost $2.6 billion in the Forms 10-Q for the first and second quarters of 2008 was materially false and misleading because the two documents failed to disclose that Nortel was delaying recognizing an impairment charge.  Plaintiffs assert that GAAP, specifically SFAS 142, required Nortel to perform an interim impairment test no later than May 2008, rather than in September 2008, when it took an impairment charge of $1.142 billion.

Because estimates of goodwill are not matters of objective fact, plaintiffs must allege that defendant Binning did not believe the statements regarding goodwill made in the Form 10-Q filings. Plaintiffs argue that Binning could not have plausibly believed that an impairment charge was not necessary in May 2008 and therefore the statements in the first and second quarter Form 10-Qs were misstatements of material fact.

In opposition to this motion, the plaintiffs rely on essentially three facts to support their assertion of falsity. In May 2008, defendants reported that the value of Nortel's goodwill was $2.57 billion as of March 21, 2008, while the market valued all of Nortel at $2.93 billion. This meant that Nortel's non-goodwill assets were valued at a total of only $360 million. Second, plaintiffs assert that Nortel had experienced "financial losses" for the five previous quarters and was losing customer orders. They argue that this reflects a sustained decline that made an interim impairment analysis of goodwill necessary. Finally, they contend that the "same circumstances" that led to the September impairment existed in May.

As noted above, estimates of goodwill are not matters of objective fact. They are statements of opinion, and understood as such by investors. To be actionable as a false statement, the FAC must adequately plead that Binning did not believe the statements regarding Nortel's goodwill. None of plaintiffs'

contentions actually speak to defendant Binning's state of mind when making statements about Nortel's goodwill in the Forms 10-Q, and so fail to state a claim against him for securities fraud. Even if he knew of facts that cut against the representations of Nortel's goodwill, that does not make the statements, which are statements of opinion, false or misleading. As explained in more detail below when the scienter allegations are discussed, in the very particular circumstances of this company and the economic climate of 2008, these allegations are insufficient to state a claim that the assurances that Nortel complied with GAAP were false.

b. Defendants' Scienter

Even if the plaintiffs had adequately pled that either defendant made a misstatement or omission of material fact, they have not adequately pled that either defendant acted with scienter. The plaintiffs do not assert in opposition to this motion that either defendant was motivated to engage in fraud because of a "concrete and personal" benefit he would receive from the fraud.[11] Instead, plaintiffs contend that the FAC pleads conscious or reckless misbehavior.

---

[11] Both defendants had acquired a substantial number of Nortel shares before the Class Period. Zafirovski did not sell any of his shares during the class period. Binning sold about 5% of his shares.

i. Customer-Related Statements and Financial Guidance

Plaintiffs' contention that they have alleged scienter by demonstrating Zafirovski's conscious misbehavior or recklessness with respect to his customer-related statements and forward-looking financial guidance is unavailing. Relying heavily on information provided by the CWs, plaintiffs contend that they have adequately alleged that Zafirovski either knew or should have known in May 2008 that Nortel was in financial distress because of a dwindling and dissatisfied customer base. Zafirovski had access, the plaintiffs argue, to non-public information regarding Nortel's customers and chose to conceal it.

In opposing this motion to dismiss, as noted above, the plaintiffs have identified Zafirovski's May 7, 2008 statements as the statements that were false and misleading. Those were forward-looking statements of general optimism regarding Nortel's progress as it worked to emerge from its troubled past, cabined by cautionary warnings. They were statements of opinion. The plaintiffs have not pleaded facts that plausibly allege that Zafirovski made these statements with the requisite scienter. This is true with respect to any particular statement that he made on May 7 and also true with respect to the May 7th statements taken as a whole and considered in context.

The information provided by the CWs does not alter this conclusion. None of the CWs asserts that he or she reported to Zafirovski or had any discussions with him, including on the issues he discussed on May 7. While the apparent absence of such direct access to Zafirovski is not controlling, the lack of such access underscores the paucity of the FAC's allegations regarding Zafirovski's scienter.

Moreover, nothing that Zafirovski said on May 7 created a duty to discuss any particular Nortel customer or to have a more detailed discussion about Nortel customers generally. As a result, no fair inference can be drawn from Zafirovski's failure to make more pointed comments about customers on that occasion. Without more, the allegations in the FAC fail to demonstrate that Zafirovski recklessly disregarded information about Nortel customers and misled the public with his statements. The FAC fails to give rise to a strong inference of his intent to deceive, manipulate or defraud investors or of his recklessness.

ii. Interim Impairment

In their discussion of scienter in opposition to this motion to dismiss, the plaintiffs principally discuss scienter in the context of their allegation that Nortel improperly delayed taking an impairment to goodwill. As already explained, the plaintiffs have not plausibly alleged that Binning did not believe the statements regarding Nortel's compliance with GAAP

or Nortel's goodwill in Nortel's first and second quarter Forms 10-Q for 2008.  Because estimates of goodwill are based on management's determination of the value of the company, they are inherently matters of judgment and subjective.

To recap, plaintiffs contend that Nortel should have taken an impairment charge by May 2008, the beginning of the Class Period.[12]  Nortel conducted an initial interim test of impairment to its goodwill in September 2008, four months after plaintiffs argue it should have done so.  Ultimately, the plaintiffs and defendants simply disagree on the timing for an impairment charge.  On September 17, amidst a global economic crisis, Nortel pre-announced its third quarter results, explaining the significant financial stress the company was under.  At bottom, the FAC alleges that statements that Nortel made in one report should have been made in an earlier report.

In its 2008 Form 10-K, filed in March 2009, Nortel listed factors that caused it to perform an interim period goodwill impairment test in September 2008.  The FAC does not suggest that there was any misrepresentation or omission in that discussion.  Unsurprisingly, those factors were substantially tied to the extraordinary market events that occurred in the

---

[12] Plaintiffs allege that the May 2008 debt offering was only possible by fraudulently delaying an impairment charge.

Fall of 2008 and that had a profound impact on many companies, not just Nortel, and on the world's economy.

Nor do the other facts on which the FAC relies to plead that the May 2008 report of goodwill was false plausibly plead Binning's scienter. Nortel's history of financial losses and the relatively low value of its non-goodwill assets were unremarkable in the context of the company's troubled history. An expectation that Nortel's new management would be able to rebuild the company's fortunes does not constitute an intent to deceive or defraud investors. Without plausible allegations of fraudulent intent or an extreme departure from the standards of ordinary care, there is no adequate pleading that Binning acted with the requisite scienter.

In sum, the FAC fails to give rise to a strong inference of scienter. Because the plaintiffs do not adequately allege that defendants made an actionable misstatement or material omission, or that that they did so with scienter, the FAC fails to state a legally sufficient claim under § 10(b) of the Exchange Act.[13]

c. Section 20(a) Claims

Plaintiffs allege control person liability under § 20(a) of the Exchange Act. Their failure to state a claim under § 10(b),

---

[13] Because the FAC fails to allege both falsity and scienter it is unnecessary to reach the defendants' remaining arguments regarding the deficiencies in the plaintiffs' § 10(b) claims.

however, precludes relief under § 20(a).  See SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996). Dismissal of the § 20(a) claim is therefore warranted.

## CONCLUSION

Defendants' October 6, 2017 motion to dismiss the Amended Complaint is granted.  The Clerk of Court shall enter final judgment for the defendants and close the case.

Dated:    New York, New York
         April 11, 2018

                               DENISE COTE
            United States District Judge